Scott F. Kocher, OSB # 015088
scott@forumlawgroup.com
Forum Law Group LLC
811 Naito Parkway, Suite 420
Portland, Oregon 97204
Tel: 503-445-2102
Fax: 503-445-2120

Lawrence M. Rolnick, NY Bar #2024784*
lrolnick@lowenstein.com
Mark B. Kramer, NY Bar #2167146*
mkramer@lowenstein.com
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-262-6700
Fax: 973-597-2469

* Motion for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **DISCOVERY GLOBAL CITIZENS MASTER FUND, LTD., DISCOVERY GLOBAL FOCUS MASTER FUND, LTD., DISCOVERY GLOBAL MACRO MASTER FUND, LTD.,** and **DISCOVERY GLOBAL OPPORTUNITY MASTER FUND, LTD.,**<br><br>Plaintiffs,<br><br>vs. | Case No.<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW<br><br>DEMAND FOR JURY TRIAL |

PLAINTIFFS' COMPLAINT                    1

**PRECISION CASTPARTS CORP.,**
**MARK DONEGAN,** and **SHAWN R.**
**HAGEL,**

              Defendants.

Plaintiffs Discovery Global Citizens Master Fund, Ltd., Discovery Global Focus Master Fund, Ltd., Discovery Global Macro Master Fund, Ltd., and Discovery Global Opportunity Master Fund, Ltd. (the "Discovery Plaintiffs" or, herein, "Plaintiffs") are purchasers of the common stock of Precision Castparts Corp. ("Precision," "PCP," or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, sue PCP and certain of its former and present officers, Defendants Mark Donegan ("Donegan") and Shawn R. Hagel ("Hagel" and, with Donegan, the "Individual Defendants", and the Individual Defendants with PCP, "Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys and agents of their attorneys, which investigation includes, among other things, a review and analysis of: PCP's filings with the U.S. Securities and Exchange Commission ("SEC"); transcripts of PCP conference calls; reports of securities analysts concerning PCP; PCP press releases; newspaper reports about PCP; economic analyses of securities movement and pricing data; publicly available accounts of employees of PCP of the environment and work; publicly available complaints against PCP by former or active employees; interviews with former employees of PCP; interviews and/or written correspondence with former customers of PCP; review of pleadings and other filings in and from, *NECA-IBEW Pension Trust Fund et al v. Precision Castparts Corp., et al*, 3:16-CV-01756 (D. Oregon), as well as the orders and

decisions, including the decision(s) on the motion to dismiss in the *NECA-IBEW* action; review of pleadings and other filings in and from *Murphy et al. v. Precision Castparts Corp. et al.*, 3:16-CV-00521 (D. Oregon) (the "Class Action"), as well as the orders and decisions, including the decision(s) on the motion to dismiss in the Class Action; and various other public sources. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

I.      **INTRODUCTION**

1.      Plaintiffs bring this action under the federal securities laws to recover for the investment losses they suffered as a result of numerous false and misleading statements made by PCP and its representatives concerning its growth – or lack thereof – and the cause of declines in PCP's revenue, earnings, and profits. PCP misrepresented to the market that a fundamental, organic decline in growth was temporary, a charade it was able to keep only by engaging in pullin transactions – termed "pulling from the left side of the calendar" or "draining the swamp" by some employees – and telling the market that one-time or special events were to blame for earnings declines when the reality was that a fundamental slowdown in business was to blame. Investors, misled by PCP as to the cause of its slowed growth, purchased stock at inflated prices – and, as PCP revealed that the one-time or short term slowed growth was neither one-time nor short term, suffered massive losses.

2.      PCP is a manufacturing company, with a focus on aerospace parts. As with most aerospace parts manufacturers, PCP's financial interests were tied to order flow from its customers. A contract signed one year might be fulfilled the next year, and what would

otherwise be modest decreases in, for example, order volume in one year could create large profit deficits years later.

3.      Before 2012, PCP had acquired existing manufacturing businesses and this drove the growth of the company.  But, with its acquisition pipeline dwindling, PCP sought to demonstrate to investors that it could (and would) generate growth organically – i.e., grow by increasing product demand from its existing, or "legacy" customers.

4.      In January 2013, before the relevant period here, PCP provided investors – for the first time in its history – with earnings guidance.  PCP told investors that its earnings target was, in effect, a doubling of earnings per share ("EPS") within three years (i.e., by 2016) (the "2016 Numbers").  PCP also assured investors that it was on track to reach this 2016 goal.

5.      But there was a bump along the way.  In August 2013, the start of the relevant period here, PCP filed its 10-Q for its First Quarter of 2014 (as explained below, PCP operated on a non-calendar year quarter system), which contained earnings lower than originally projected.  At first glance, this did not fit with the three year guidance or with PCP's assurances.

6.      But PCP was in the midst of explaining away its poor results.  The Company attributed its underperformance, in part, to modest – temporary – destocking by some of its customers, which included Rolls-Royce Limited ("Rolls-Royce"), a key PCP customer. Inventory destocking refers to the practice of reducing inventory on hand relative to production. That is, in destocking, a manufacturing company reduces the amount of inventory it keeps on hand to support its manufacturing process.

7.      PCP told investors that the inventory reduction by its customers was temporary and not representative of any long-term declines in demand for its products.  Once the key customer had adjusted its inventory levels, PCP told investors, the customer's demand for PCP

products would quickly return to historic levels.  The Company reassured investors that the – temporary – destocking would end within 2013 and would not impact the 2016 Numbers.

8.      Long term versus short term demand declines are relevant to investors; and PCP's explanation of the decline as short term and temporary was reassuring. A short-term inventory destocking did not signal any weakness in long-term demand or sales prospects nor that long term work flow and organic growth was in jeopardy.

9.      PCP went on reassuring investors of the short term nature of its declining growth. Throughout the relevant period, PCP provided assurances as to its growth, and the 2016 Numbers.

10.      In July and October 2014, PCP again reported earnings misses – out of line with PCP's prior assurances.  But Defendants continued to assert to the market that this was the result of short-term, temporary items and not attributable to a reduction in long-term demand.

11.      What investors did not know is that the July and October 2014 earnings misses were the result of a much bleaker reality for PCP: that despite PCP's assurances, the short term explanation for declining growth was false, the 2016 Numbers could not be relied on, and in fact PCP was experiencing long term, fundamental, organic growth decline in demand for its products.  Destocking at Rolls Royce was not a temporary, short-term, event, but was part of the larger pattern of a structural decline in demand for PCP products.

12.      As late as December 3, 2014, PCP continued to affirm that the Company was on track to meet the 2016 Numbers.

13.      Given that PCP was a manufacturing business with long lead times (and barring an explosion in need for aircraft parts) – investors had no reason to know, in 2013, or at any time during the relevant period, that PCP's assurances were false.  PCP, better than anyone, would

know what its manufacturing pipeline looked like.   PCP, better than anyone, would know whether the ability to meet the three year guidance, announced in 2013 but applicable through 2016, was in question.   And when the disclosures began, in 2014, showing reduced earnings, PCP explained it away with further misrepresentations.

14.    In January 2015, PCP again disappointed the market with its financial results. While the Company again tried to attribute the problem, at least in part, to destocking, analysts saw through the charade.   The analysts concluded that what had been described as a temporary inventory management issue at one of PCP's customers was apparently a long-term reduction in demand for the Company's products. In response to these disclosures, analysts also concluded that, contrary to the Company's repeated assertions throughout the Relevant Period, PCP's fiscal 2016 target was not attainable, and openly questioned the credibility of PCP's management. The Company's stock price was punished as a result, falling more than nine percent in a single day, and erasing approximately $2.86 billion in market capital.

15.    On January 22, 2015, the Company held a conference call on which its executives admitted that they had omitted material information in their communications with investors and, in particular, failed to previously update the 2016 Numbers even though "things [had] changed" since 2013.

16.    Blaming temporary short term issues, when, in reality, long term demand declines were the cause of earnings misses, and failing to advise the market of the Company's inability to meet the 2016 Numbers was only part of how PCP was misleading the market.

17.    To reach even the lower sales and financial targets, including revenue and profits, that PCP *was reporting*, the Company engaged in a series of unsustainable maneuvers creating

the illusion of organic growth. The reality was the opposite: PCP was experiencing reduced organic growth because of demand declines, tied to a loss of market share.

18.    The key maneuver was to engage in "pullin" transactions.    Whether called "pulling in" or "pulling from the left side of the calendar" or "draining the swamp" – the idea was simply:  if PCP could, near quarter's end, convince a customer to accept a year's worth of product in a single quarter, the Company could immediately book that entire year's worth of sales and meet its quarterly sales goals.  While this obviously would create problems for the *next* quarter, such problems would only manifest if the Company did not then pull-in more transactions to *that* quarter.  As part of the pull-in activity, PCP would also put immense pressure on employees and customers to make early orders, changing the timing of the sales to meet the quarterly numbers – and deceiving investors.

19.    These practices, unknown to the public, created a disastrous spiral:  the more the Company "pulled in" sales by various means in one quarter, the harder it would be for it to meet targets in the next quarter, requiring ever more extraordinary means to persuade customers to take on inventory in excess of their actual current needs.  PCP cannibalized its own future orders to meet the quarterly expectations of the present.

20.    Carrying inventory much in excess of short-term needs is, of course, not a sustainable business model for PCP's customers, as it creates an economic and reporting burden for companies. This is because there are a number of costs associated with carrying inventory, such as the opportunity cost of the money used to purchase the inventory, the cost of warehousing and handling the inventory, and the cost of deterioration or obsolescence, among others.

21.     In one, critical, example, in mid-2013, Rolls-Royce announced a dramatic change in its inventory management practices, including a commitment to carrying less inventory. This policy change squarely collided with the undisclosed "pulling in" practices upon which PCP had depended in the past. Now the Company would have to sell to Rolls-Royce smaller quantities of inventory more closely tied to this key customer's current demand—permanently reducing sales to this crucial customer to a level lower than what PCP had enjoyed historically when it was able to "pullin" sales.

22.     Beyond basic economics, PCP customers had other reasons to eventually refuse early ordering – PCP competitors, who were more customer-centric, technologically able, and provided a superior product.

23.     Manipulative pull-in transactions allowed PCP to meet a certain base level of anticipated results; the failure to meet the even higher, assured, guidance, was (falsely) blamed on short term, temporary, issues, instead of the reality of long term demand declines.

24.     During the relevant period, PCP continuously assured and reassured investors that earnings misses were attributable to temporary, short-term events, while PCP and its executives knew, or recklessly ignored, that long term issues were the cause, including the fact that demand from a key customer would never recover to levels PCP had maintained in the past.  While the Company attributed its earnings misses to short-term destocking spawned by a key customer's inventory reduction, it failed to disclose to investors the permanent damage Rolls-Royce's change in inventory management policy would inflict upon PCP's sales.  Once the key customer ceased to "work through" its glut of inventory, there was no return to historic demand levels.

25.     Indeed, according to the complaint filed in *Murphy et al. v. Precision Castparts Corp. et al.*, 3:16-CV-00521 (D. Oregon) (the "Class Action Complaint")

in response to public statements by the Company that its earnings misses were due to continuing temporary inventory destocking at Rolls-Royce, a senior Rolls-Royce executive called a top-level PCP manager about the Company's claims, asking "*what the hell are you talking about?*"

26.     The Company also failed to disclose that even the earnings levels it *was* achieving were the result of pull-in transactions (i.e., pressuring customers to make early orders in order to paint a rosy picture for the current quarter).

27.     The revelations of the fraud occurred over a series of earnings releases in 2014 and 2015, whereby the market learned of the fraudulent nature of PCP's assurances.  While PCP reassured investors in 2014 that it would still meet the 2016 Numbers, it was in early 2015 that analysts saw the truth and broadcasted it to investors, causing the Company's stock price to plummet.  The Discovery Plaintiffs suffered tens of millions of losses as the truth was revealed.

## II.     <u>JURISDICTION AND VENUE</u>

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, Section 27 of the Exchange Act.  PCP is incorporated in this District and maintains its principal place of business in this District.  Furthermore, certain of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

31.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.   Plaintiffs

32.   Plaintiffs are investment funds managed by Discovery Capital Management ("DCM"), a central advisor to Plaintiffs located in South Norwalk, Connecticut.

33.   Plaintiff Discovery Global Citizens Master Fund, Ltd. is a Cayman Islands fund managed by DCM.  The dates on which Discovery Global Citizens Master Fund, Ltd. purchased PCP common stock during the relevant period are attached hereto as Exhibit A.

34.   Plaintiff Discovery Global Focus Master Fund, Ltd. is a Cayman Islands fund managed by DCM.  The dates on which Discovery Global Focus Master Fund, Ltd.  purchased PCP common stock during the relevant period are attached hereto as Exhibit B.

35.   Plaintiff Discovery Global Macro Master Fund, Ltd. is a Cayman Islands fund managed by DCM.  The dates on which Discovery Global Macro Master Fund, Ltd. purchased PCP common stock during the relevant period are attached hereto as Exhibit C.

36.   Plaintiff Discovery Global Opportunity Master Fund, Ltd. is a Cayman Islands fund managed by DCM.  The dates on which Discovery Global Opportunity Master Fund, Ltd. purchased PCP common stock during the relevant period are attached hereto as Exhibit D.

### B.   Defendants

#### 1.   Corporate Defendant

37.   Defendant PCP, a manufacturer of components primarily for industrial and aerospace customers, is a Delaware corporation with its principal executive offices located at 4650 S.W. Macadam Ave., Suite 400, Portland, Oregon.  The Company's stock was listed on the

New York Stock Exchange (the "NYSE") under the ticker symbol "PCP," until the Company was privately acquired on or around January 29, 2016 by Berkshire Hathaway.

38.     The Company operates in three principal business segments:  (1) Investment Cast Products; (2) Forged Products; and (3) Airframe Products.

### 2.     Individual Defendants

39.     Defendant Mark Donegan has served as the Chairman and Chief Executive Officer ("CEO") of PCP since 1992.  During the Relevant Period, Donegan reviewed, approved, and signed PCP's false and misleading SEC filings.  Donegan also reviewed and approved false and misleading press releases and Form 8-Ks issued by PCP during the Relevant Period. Donegan also participated in conference calls with securities analysts, during which PCP's false and misleading statements filed with the SEC and included in press releases were presented and discussed. Donegan personally made statements on these conference calls about customer inventory destocking, including stating to investors that the destocking was temporary and providing a specific time by which destocking would purportedly end. Donegan also repeatedly stated that the Company was on track to meet its fiscal year 2016 EPS targets.

40.     Defendant Shawn Hagel has served as the Executive Vice President and Chief Financial Officer of PCP since 1997. During the Relevant Period, Hagel reviewed, approved, and signed PCP's false and misleading SEC filings. Hagel also reviewed and approved false and misleading press releases and Form 8-Ks issued by PCP during the Relevant Period. Hagel also participated in conference calls with securities analysts, during which PCP's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

41.     Defendants Donegan and Hagel are collectively referred to as the "Individual Defendants" and, together with PCP, as the "Defendants." The Individual Defendants directly

participated in the management of PCP's operations, including its accounting and reporting functions, had the ability to and did control PCP's financial reporting, and were privy to confidential information concerning PCP and its business, operations and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

## IV.   FACTUAL ALLEGATIONS

### A.   Company Background and Growth Strategy

42.    Since its founding in 1953, PCP achieved significant growth, becoming a market leader in manufacturing large, complex structural investment castings, airfoil castings, forged components, aerostructures and highly engineered, critical fasteners for general and industrial customers. PCP's aerospace customers include General Electric Corporation ("GE"), The Boeing Company ("Boeing"), Airbus SAS ("Airbus"), Pratt & Whitney ("P&W"), and Rolls-Royce. The Company relies on the aerospace market for 70 percent of its overall sales.

43.    PCP states in its SEC filings that Rolls-Royce is one of the Company's "key customers." PCP supplies Rolls-Royce with, among other things, components for Rolls-Royce's Trent 1000 turbofan engine, which powers the Boeing 787 Dreamliner, and the Trent XWB, which powers the Airbus A350 XWB.

44.    Between 2009 and 2012, PCP acquired over 15 different companies, including Carlton Forge Works in 2009 and TIMET in 2012. PCP's aggressive acquisition strategy allowed it to gain market share and enter new markets. The acquisitions also contributed to large

increases in profits and growth.  For example, from fiscal year 2010 to fiscal year 2013, the Company increased its net income by almost 65%, or $500 million.[1]

**B.    Before the Relevant Period Begins, PCP Announces**
**Fiscal Year 2016 Earnings-Per-Share Target**

45.    Historically, PCP did not issue guidance.  But, starting in 2012, before the Relevant Period, opportunities for new acquisitions dwindled.  The result of this was that PCP's earnings began to fall below consensus market estimates.  Without acquisitions to drive growth, PCP would need to show investors that it could produce sustainable organic long-term growth.

46.    The Company flagged this pivot in its growth strategy during a January 24, 2013 earnings conference call on which PCP, provided a target EPS of $15.50 to $16.50 for fiscal year 2016 (the 2016 Numbers, referenced previously). As part of this January 24, 2013 announcement to investors, PCP provided investors with a slide titled "PCP's FY2016 Roadmap," which indicated that it would achieve its EPS target *solely* through organic growth:

---

[1] During the Relevant Period, Precision's fiscal year was not the same as the calendar year. The Company's fiscal year during the Relevant Period was as follows:  first-quarter fiscal 2014 began on April 1, 2013 and ended on June 30, 2013; second-quarter fiscal 2014 began on July 1, 2013 and ended on September 29, 2013; third-quarter fiscal 2014 began on September 30, 2013 and ended on December 29, 2013; fourth-quarter and full-year fiscal 2014 began on December 30, 2013 and ended on March 30, 2014; first-quarter fiscal 2015 began on March 31, 2014 and ended on June 29, 2014; second-quarter fiscal 2015 began on June 30, 2014 and ended on September 28, 2014; third-quarter fiscal 2015 began on September 29, 2014 and ended on December 28, 2014; fourth- quarter and full year fiscal 2015 began on December 29, 2014 and ended on March 29, 2015.



47.     PCP reiterated in the slide presentation that future mergers and acquisitions did not factor into this guidance, and instead provided "opportunities for results ***greater*** than $15.50-$16.50 per share for FY16."[2]  Donegan assured analysts during the January 24, 2013 conference call that any future acquisitions would simply be "additive" to this guidance, stating that they would be "over and above" the earnings generated through organic growth.

48.     Defendant Donegan further assured investors that he understood the components of the earnings target and knew exactly what level of sales PCP needed to generate to reach this target, responding to a question of  whethe there was a sales level that would get PCP to its targets with "Yes."

49.     Analysts responded positively to PCP's EPS guidance and became heavily focused on the Company's ability to hit this target.  Analysts at RBC Capital Markets, for example, stated in a report published the same day as the Company's announcement that

---

[2] All emphasis is added unless otherwise noted.

"[m]anagement has long been averse to giving any financial guidance, and so it is a big step to see [PCP] providing an FY16 EPS target of $15.50-16.50."

50.     Likewise, a KeyBanc analyst noted that the Company's "[w]eak quarterly results were *clearly overshadowed by management's FY16 earnings outlook*."

51.     As detailed below, the Company continued to reaffirm the 2016 Numbers, despite knowing that decreasing demand for its products (and with pulling in sales becoming impossible), would have a long-term impact on the Company's profitability and make it impossible to achieve the 2016 Numbers.

### C.     Unbeknownst to Investors, Precision Resorts to "Pulling In" Strategies to Create the Appearance of Sustainable Growth

52.     In fact, unbeknownst to investors and contrary to the Company's representations that it could achieve sustained EPS growth without reliance on acquisitions, PCP was not experiencing increasing sustainable demand from its customers. Anxious to meet its targets, PCP resorted to various unsustainable means of increasing sales to meet earnings targets and to convince investors that it had sustainable organic growth in order to justify its aggressive 2016 EPS target. In this respect, PCP's sales volume came to turn not on the current manufacturing needs of its customers like Rolls-Royce, but on its ability to persuade customers to make advance purchases of enough product for the Company to meet its internal quarterly targets.  Various terms were used for this practice, including "pulling in" sales, "pulling [or taking] from the left side of the calendar" or, most descriptively, "draining the swamp" – i.e., draining out all possible orders to 'fill' the needed quotas.  The Class Complaint also references the Company referring to the practice as "charging the cliff."

53.     In order to meet internal quarterly targets that exceeded demand, PCP would "pullin" future sales of its products. "Pulling in" sales means to bring sales that would normally

happen at some point in the future closer to today. The way PCP did this was by inducing, or pressuring, customers into accepting early delivery of more product than these customers actually needed at the time, so PCP could recognize the revenue now and hit its own quarterly sales targets. If successful, this strategy would allow the Company to report higher sales in the current quarter, thereby allowing it to meet or even exceed market expectations while creating the illusion that the Company's organic sales were growing sustainably.  But in truth, the long-term demand for the Company's product remained flat and future sales were being sacrificed to create the illusion the company was meeting investor expectations.

54.     PCP was, for a time, able to execute this strategy.  While this did help the Company meet its quarterly targets and conveyed the appearance of sustainable growth to the market, it created numerous risks to the Company's future profitability that were not disclosed to investors. For example, it put proportionately more pressure on subsequent quarters, because future sales had already been "pulled in," and so the Company had to keep generating progressively higher numbers by raiding orders from further in the future to make up for it.

55.     On information and belief, determined via Plaintiffs' independent investigation, other terms for the pullin practice included "pulling from the left side of the calendar" and "draining the swamp."  According to a former PCP employee – who specifically used the "draining the swamp" term – PCP had engaged in pullin transactions while he was there, appeared to have been engaging in such transactions before he ever arrived, and was engnaing in such transactions as he left.

56.     The pullin practices were described to a former PCP employee, a former operations manager at a PCP subsidiary, SPS Technologies, who was at the subsidiary during the

relevant period, and who stated that pullin transactions occurred at PCP.  This former employee corroborated that PCP pressured employees and customers to meet quarterly sales targets.

57.    A further former PCP employee, who left the company at the very start of the relevant period, also corroborated that PCP engaged in pullin sales.  This individual stated that PCP exerted tremendous pressure to meet end of quarter numbers.

58.    Yet another former PCP employee, a former Operations Manager at a PCP subsidiary during the Relevant Period spoke to Plaintiffs' attorneys' agents and corroborated PCP's pressure to "pullin" sales and business.

59.    PCP's efforts to pullin sales each quarter led to extraordinary pressure on employees to hit quarterly targets.   Publicly available anonymous reviews of working at PCP speak of extreme pressure from the top to hit sales goals, and, that PCP is "Always pulling orders from ahead to make current quarter" – the exact kind of pullin transactions that interviewed former employees discussed.

60.    Other publicly available reviews of working at PCP speak to similar activity.  One review states that PCP engages in "lots of book cooking in metrics and dollars"; another states "PCP sets sales goals that can't be met by the facilities in order to falsify growth."

61.    Additional information from former PCP employees confirms this.  According to multiple former PCP employees interviewed by Plaintiffs' attorney's agents, pullin transactions were 'common practice' and every quarter followed the same script– pressure to pullin transactions to meet the too-high target numbers.

62.    Further, a former Pratt & Whitney executive who was a customer of PCP directly confirmed in a message to Plaintiffs' attorneys' agents that: "As a PCC customer during this

period, end of quarter pullin requests where [sic] common practice at PCC prior to the berkshire [sic] buyout.  PCC does put significant pressure on leaders to meet quarterly targets."

63.    A former PCP employee involved in sales explicitly stated that Pratt & Whitney refused to go along with the pullin charade, but that Rolls Royce and others did so – for a time.

64.    The pressure on employees to meet sales goals is corroborated by an August 3, 2016 Bloomberg profile of Donegan titled "Warren Buffett Made a Big Bet On an 'In-Your-Face' CEO." Relying on 15 current and former PCP employees, including some in senior management, the article revealed that Donegan would scream, curse, and even physically threaten his subordinates during quarterly reviews, and that as a result of the intense pressure, managers would go to "great lengths" to hit the Company's quarterly targets. The article also notes that every quarter, Donegan received "the same set of 26 charts" from each PCP factory "that highlighted things like productivity, earnings, market share and fixed costs per employee," and that Donegan "spends about 1,000 hours a year on his jet so he can keep tabs on his business."

65.    As a dominant market force in the aerospace industry, and a major employer, PCP exerts an incredibly chilling influence on former employees who may wish to provide information on the practices of the business.  Multiple former PCP employees expressed that they had information about the pullin transactions, or about PCP's negative business practices, but were unwilling to speak about those practices because of fear of loss of business, or reputational consequences in the marketplace.  On information and belief, further information confirming the pullin practices, and their necessity to PCP's results will be developed during discovery, via discovery of both Defendants' own documents and witnesses, as well as by, if

necessary, compulsory process to witnesses unwilling or unable to speak without compulsory process.

66.     The Class Complaint provides extensive corroboration, and additional factual basis, for the information provided to Plaintiffs.

67.     The Class Complaint corroborates the information herein in citing Confidential Witness One ("CW1"), an Executive Vice President of PCP from 2009 to October 2014, reporting directly to Defendant Donegan.

68.     Plaintiffs have independently confirmed the identity and PCP association of CW1.

69.     According to the Class Complaint, CW1 explained that once PCP stopped acquiring companies regularly, the Company's ability to drive earnings suffered. This led to a focus on pulling in sales and meeting quarterly targets. Further, according to the Class Complaint, the Company searched for whatever they could "pullin" at the end of every quarter and would offer significant discounts to make the current quarter.  According to the Class Complaint, CW1 described the amount of pull-ins that were done across the business as "unbelievable."   According to the Class Complaint, the goal was to make the quarter at any cost and the Company did not worry about what this meant for the next quarter.  PCP knew, the Class Complaint states, attributing the information to CW1, that the customers did not yet need the product but still persuaded the customers to accept it early. According to the Class Complaint, the practice of pulling in sales would work until customers stopped agreeing to accept early delivery.

70.     According to the Class Complaint, PCP worked with its customers, including Rolls-Royce, to accept early delivery of product because the Company was driven to meet its own quarterly numbers. According to the Class Complaint, persons in the Company referred to

this practice as "charging the cliff."  This information corroborates the same kinds of activities that other former PCP employees described as "draining the swamp" or "pulling from the left side of the calendar."

71.     According to the Class Complaint, citing a second confidential witness (CW2), employees at PCP were instructed to focus all efforts during the last three weeks of a quarter on pulling in sales and shipping out all product to customers. PCP would do this by working with customers and coming up with ways to induce them to accept early delivery. According to the Class Complaint, CW2 stated, "we would give them credit wherever we thought they would accept it . . . and just to get the product out the door."

72.     Further, according to the Class Complaint, PCP's philosophy was "absolutely do whatever you had to do to hit a quarter."

73.     According to the Class Complaint, a third confidential witness ("CW3"), who was a Supply Chain Director at SPS Technologies, a PCP subsidiary, from July 2013 to December 2014, indicated that PCP routinely shipped product early to its customers in order to ensure the Company met its corporate numbers. According to CW3 this amounted to "ship at all costs," no matter what discount had to be given. CW3 also explained that Defendant Donegan "very heavily led" the command to prematurely ship product.

74.     According to the Class Complaint, because PCP was able to induce customers to buy the amount of product PCP needed to meet its own numbers, the Company's manufacturing was relatively insensitive to its customers' actual needs.   According to the Class Complaint, citing CW4, who worked as a Sales Manager at PCP in the Investment Casting Division from June 2014 until August 2014, PCP dictated delivery rates with its customers, and was able to get customers to accept product regardless of whether or not they needed it at the time. According to

the Class Complaint, PCP had a practice of "pulling in" sales, including sales to Rolls-Royce, at the end of a quarter and the Company would produce and sell product to Rolls-Royce and other customers not based on customer's then-existing demand but instead to meet PCP's own internal forecasts.

75.    According to the Class Complaint, citing CW4, analysis of the Company's financial results in prior quarters, including the quarter ending June 30, 2014, confirmed the unsustainability of this pulling in practice. According to the Class Complaint, CW4 performed this analysis as part of a "fire drill" that resulted from PCP's sales and revenue misses—*i.e.*, sales and revenues below PCP's forecast. Further, according to the Class Complaint, CW4 presented those findings at a meeting in July 2014 at the Company's headquarters, before PCP disclosed its first quarter 2015 results. Finally, according to the Class Complaint citing CW4, after CW4 presented those findings, CW4 was no longer included in any additional meetings, nor was CW4 allowed to interact with anyone above CW4's own level within the Company, and was let go shortly thereafter.

76.    Plaintiffs have independently confirmed the identity and PCP affiliation of CW4. Corroborating existing information, CW4 confirmed that pulling in transactions occurred at PCP and that product was stuffed down the throats of PCP customers.

77.    As discussed above, the ability to pullin transactions could only make PCP's numbers look favorable for so long, eventually, the music would stop.

**D.**    **Rolls-Royce Announces Plan To Cut Costs and Reduce Inventory**

78.    Efforts at Rolls-Royce to permanently rationalize and reduce its inventory positions resulted in material and permanent declines in its demand for the Company's products.

79.    On June 18, 2013, at the Paris Air Show, Rolls-Royce announced plans to improve the profitability of its passenger jet-engine business, which had been trailing its

competitors. In 2012, for instance, Rolls-Royce's civil aerospace unit recorded an operating margin of only 11.3 percent, compared with 18.7 percent at GE's aviation business.

80.     As part of its plan to improve profitability and cut costs, Rolls-Royce announced that it was engaging in inventory policy changes that would cut its inventory in half. At the Paris Air Show, Rolls-Royce President of Aerospace, Tony Wood, stated:

> [B]y far the biggest opportunity in our business on cash is inventory. We're carrying today around three billion pounds of inventory at the group level… So there's around about a one and a half billion pound opportunity in our balance sheet today, over time to start to address inventory and a half a turn improvement off around about 400 million pounds.

Wood also specifically indicated that the Boeing 787 program—a program for which PCP supplied Rolls-Royce with parts—provided a strong inventory reduction opportunity:

> We're running a tighter ship these days and absolutely my message to the team and my intent is that we continue to both lean out and sustain that performance. Trent 1000 going into the 787, less mature, earlier stage of its production programme, ramping up quickly now, 100% on time to due day. And it's been there for the last nine months, one of the most challenging programmes in terms of trying to work with the customer on maturing that aircraft. But the drum beat of the business, managing flow, managing inventory, getting that customer focus in.

81.     In discussing Rolls-Royce's changes to inventory management, as well as how Rolls-Royce previously managed inventory, Wood added:

> So we are gradually turning the dials up on our management of inventory. The aero organisation helps in terms of looking at the alignment and the plan that drives inventory across the business. We've got much better visibility across the value stream. And particularly we're taking a lot of action on looking at buffers. . . . **But across our business the way we were organised previously we were optimising and making buffer decisions around different elements in the value chain rather than looking at it from demand signal right the way through to the supply chain**. That is throwing off lots of opportunities to look at a better leaning out of that supply chain which will deliver cash.

82.     Rolls-Royce's announcement made clear that it was adopting a "lean management" approach to inventory. Lean inventory policies such as the one adopted by Rolls-

Royce are one means by which companies reduce expenses. Carrying high amounts of inventory long in advance of when it is needed is expensive. Inventory is a large piece of a company's expense load, as it has substantial carrying costs. A lean approach to inventory management would, of course, be inimical to PCP's practice of "pulling in" sales and inducing customers to carry inventory long in advance of their needs.

83.    While such a policy would be economically beneficial for Rolls-Royce, it represented a drastic change for PCP, which relied upon Rolls-Royce's willingness to carry high levels of inventory to accommodate PCP's efforts to hit quarterly numbers. Rolls-Royce's announcement therefore signaled to PCP the death knell for its pullin strategy, and necessarily resulted in a permanent—not temporary—downturn in its business with Rolls-Royce.

### E.    PCP Sets out the "Temporary" Destocking <u>Explanation</u>

84.    While Rolls-Royce's new inventory policy had an immediate impact on PCP's sales, Defendants falsely assured the market that this was merely a temporary and immaterial issue that had no effect on the Company's ability to meet its 2016 EPS target. For example, on July 25, 2013, before the Relevant Period here, PCP issued a press release announcing its first-quarter fiscal 2014 financial results, which missed consensus estimates on revenues and EPS. On an earnings conference call held that same day, Defendant Donegan reported that aerospace sales grew by 30 percent from the prior year, but that organic aerospace sales were flat, due, in part, to "de- stocking by some of [the Company's] engine customers." Defendant Donegan assured investors that the destocking activity was temporary and that demand would return to historic levels in the near future:  "Our base sales were flat. . . . We have seen some modest de-stocking by some of our engine customers but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply *an inventory realignment* that we experienced and the demand does show back in the future."

85.    On that same conference call, JPMorgan Chase & Co. ("JP Morgan") analyst Joe Nadol asked for more specifics on the anticipated impact of engine customer destocking. In response, Defendant Donegan again explained that "a couple" of engine customers were employing an "inventory reduction in this calendar year," but he represented that demand would remain stable and actually increase in the Company's fourth-quarter 2014:  "We do see the demand sitting in our Q4."

86.    By the time Donegan had made these statements, Rolls-Royce had already shifted from accepting more product than it currently needed to buying from PCP only what it needed to maintain a lean inventory. This would permanently, not temporarily, reduce demand for the Company's products and harm the Company's ability to hit its targets because it could no longer rely on Rolls-Royce to help pullin sales.

87.    In addition to his statements regarding destocking and in response to a question regarding whether the Company had sufficient organic growth capacity to meet its fiscal 2016 EPS target, Donegan assured the market that it did and that it was "on th[e] slope" (*i.e.*, was growing at a rate that would allow it to meet its target). He also assured investors that the sales "number [that] gets me to my [20]16 [EPS target] is stuck on people's foreheads." In other words, it was at the forefront of everyone's mind at the Company.

88.    Although PCP did not initially specify which engine original equipment manufacturers ("OEMs") were destocking, analysts at Cowen suggested in an August 2013 report that destocking was likely most pronounced at Rolls-Royce, in connection with the Boeing 787 engines.

89.    Thus, the "temporary" destocking explanation was born, pre-Relevant Period. Even if PCP had believed, as of July 2013, that – in fact – the destocking event would be short term and temporary, subsequent events would remove any ability to rely on that explanation.

**F.    The Relevant Period Begins:  PCP Falsely Links
Earnings Misses to Temporary, Short Term Issues**

90.    On August 8, 2013, PCP filed its 10-Q for the first quarter 2014 ("1Q14 Form 10-Q").  In this 10-Q, PCP had the chance to 'walk back' or alter the explanation it had given only two weeks before that destocking was to blame for its missed earnings; that destocking was a temporary, short-term issue.  PCP did not walk back the temporary destocking explanation – instead, over the next couple months, PCP doubled down on it.

91.    PCP continued to experience revenue shortfalls, but falsely assured investors that they were the result of temporary destocking and that demand would return to historic levels in the near future. On September 17, 2013, at the Citi Global Industrials Conference, Citi analyst Jason Gursky asked Defendant Donegan for an update on engine customer destocking and when PCP expected demand to return. In response, Donegan now stated that destocking would end "as we go into [fourth-quarter fiscal 2014], [first-quarter fiscal 2015]," after which PCP would experience an increase in demand.

92.    This statement was false, or at minimum, grossly misleading.

93.    On October 1, 2013, Discovery began buying PCP stock.

94.    Donegan made a similar misstatement on October 24, 2013, when PCP issued a press release announcing its second-quarter fiscal 2014 financial results. On an earnings conference call held that same day, Defendant Donegan explained that the Company continued to experience engine customer destocking, but reiterated that demand would return, again assuring investors that PCP was not losing market share. Defendant Donegan also affirmed that

the Company was still on track to meet its EPS guidance. David Strauss, a UBS analyst, asked whether "these results were just one data point on the long road toward your $16 target. Just curious, were the results actually ahead of your internal plan?" Defendant Donegan explained that "we have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. So *we hover around that line*."

95.    That day, Discovery purchased almost $23 million of PCP stock.

96.    In the wake of such statements, Rolls-Royce began to field calls from analysts with questions about the temporary destocking Donegan had referred to.

97.    According to the Class Complaint, a Rolls-Royce procurement executive called a PCP executive saying ***"You did not tell us about destocking, what is destocking? What the hell are you talking about?"***

98.    While later admissions from PCP would confirm that destocking was a smoke screen, PCP knew destocking was not an actual cause of its earnings misses from the start. According to the Class Complaint, the Company simply used the term "destocking" as a catchall for general "softness" it was seeing in demand. Further, according to the Class Complaint, it was understood internally that the Company's demand problems could not possibly be the result of temporary destocking.

99.    On information and belief, informed by interviews with former PCP employees by Plaintiffs' attorneys, and their agents, as well as the Class Complaint, PCP's weakened demand was a result of customers, including Rolls-Royce, refusing to continue to engage in pullin transactions at a rate necessary to make the quarterly targets.  It was the natural result of engaging in earlier pullins, not some temporary destocking, that caused PCP to miss later earnings targets.

100.    Investors, including Plaintiffs (via their investment advisor), however, continued to rely on the Company's misrepresentations. Indeed, following the October 24, 2013 conference call, analysts reported that while customer destocking continued, demand would return on schedule. For example, analysts at Wells Fargo explained that the "engine customer destocking that hurt [first-quarter 2014] results remained unchanged in [second-quarter 2014] and this volume is still expected to return in [fourth-quarter 2014]." Likewise analysts at KeyBanc reported that "management indicated that the engine destocking trend that surfaced last quarter has remained stable, and accordingly, remains on track to normalize in early [calendar-year 2014]."

101.    In the wake of the Company's misrepresentations and while PCP's common stock price was artificially inflated as a result of Defendants' fraud, Defendant Hagel engaged in suspicious stock transactions. Specifically, on November 27, 2013, Defendant Hagel exercised options to purchase 25,000 shares at $101.41 per share, and immediately sold those shares at $259.93 per share, recognizing an instant profit of $3,963,000. Prior to this option exercise, Defendant Hagel directly owned just 19,899 shares of PCP common stock.

102.    As 2013 progressed, PCP continued to assure investors that destocking was temporary and that demand would soon return. On December 3, 2013, at the Credit Suisse Global Industrials Conference, PCP indicated, for the first time, that destocking was specific to one engine customer. Specifically, Defendant Donegan explained that "one of the engine guys" had ordered an excessive amount of inventory from PCP to remain "protected" against fluctuations in demand for the Boeing 787 program, but that "it is now starting to balance itself out . . . ." Defendant Donegan added, "it has been more of . . . rather than destocking, a lot of

times means you fall off. It has been more of a holding at a flat level, and not taking a step up. But I think that step up does start coming in, the middle of next year."

103.    Once again, Defendant Donegan affirmed the soundness of the Company's long-term guidance and dismissed concerns that destocking could impact the Company's ability to achieve the organic growth necessary to reach its EPS target. Robert Spingarn, a Credit Suisse analyst, asked "about the sequential EBIT growth of 3.5%, roughly, to get to your targets" and whether "those numbers are going to fluctuate to some extent and market demand is going to play a role." Donegan stated:  "[O]ur mindset is going to be linear. You are going to see different movements. . . . *[W]e did not get the acceleration from – because of the destocking. You know what? We pull the other levers*."

104.    PCP's consistent assurances mattered to investors.  While earnings had missed targets, the reason for that miss – a temporary destocking versus a long term trend – were critical to determining the likelihood that the 2016 Numbers would pan out and examining the Company's long-term prospects.  And here was PCP  reassuring investors of the 2016 Numbers.

105.    Information as to destocking was also particularly relevant for a company like PCP, in PCP's business.  Whereas other companies may be able to find new markets and new customers to make up the lost revenue, aerospace parts is not a particularly fractured business; there are two main airplane manufacturers, only a few major engine manufacturers, and then those that supply them.  If a major PCP customer was experiencing a one time, short term event, this made little difference over the next three years as the base need for airplane plarts would remain the same.  But if PCP itself was losing market share, or its earnings were suffering because it had engaged in past pullins, then that was revenue that would never exist in the future – not now, not ever.  While PCP was telling investors, it was the former, the latter was the truth.

106.    On January 23, 2014, PCP issued a press release announcing its third-quarter fiscal 2014 financial results, again falling short of analysts' expectations. On an earnings conference call held that same day, PCP continued to explain that destocking was temporary and that demand would return in the next quarter, as the Company had previously represented.

107.    Specifically, Wells Fargo analyst Sam Pearlstein sought an update on destocking and asked whether "we [can] expect[] the March quarter to have a pretty sizeable step up in terms of the top line, just based on what you have said throughout the year?" In response, Defendant Donegan stated, "do we expect to see growth in [the fourth-quarter fiscal 2014] and [the first-quarter fiscal 2015]? Yes . . . ." Donegan added:

> [Fourth-quarter fiscal 2014] has in it embedded growth. It has it in it because there are demands coming from our customers, it has it in it because we pick up three more manufacturing days. It has it in it because we have been carrying some inventory, and it has it in it, because certainly, of . . . this [third-quarter fiscal 2014] dynamic we got into.

108.    Defendant Donegan also rejected the notion there had been any negative developments in the assumptions underlying PCP's 2016 EPS target, stating that "nothing has gone negative from that standpoint" and affirming that the 2016 EPS "framework is still intact."

109.    Analysts accepted PCP's explanation.  Indeed, one analyst from Edward Jones in St. Louis, looking at the Company's announcement, specifically attributed the earnings miss to a "one-time issue."

### G.    Defendant Donegan Exercises Stock Options and Sells Shares For a Substantial Profit Just Weeks Before the Truth Begins to Be Revealed

110.    Having assured the market that PCP's earnings misses were the result of temporary, short-term destocking at one customer, Defendant Donegan cashed in on the inflated stock price.

111.    Just weeks before investors began to learn the truth about the Company's demand problems, Defendant Donegan exercised options on PCP's shares and sold them for a substantial profit.

112.    Specifically, between May 13, 2014 and May 14, 2014, Defendant Donegan exercised options to purchase 89,752 shares of PCP common stock (nearly 40 percent of the 226,258 shares he owned at the time) at a price of $101.41, for a total of $9,101,750. Defendant Donegan immediately sold those shares at prices between $253.03 and $254.76, for a total of $22,858,867, and thus instantly recognized a profit of $13,757,117.

### H.    The Company Again Attributes Earnings Misses to Temporary Destocking

113.    On July 24, 2014, PCP issued a press release announcing its first-quarter fiscal 2015 financial results, which missed analysts' earnings estimates yet again. On an earnings conference call held that same day, Defendant Donegan for the first time stated that the destocking activity was occurring specifically at Rolls-Royce.

114.    On news of this earnings miss, PCP's stock price fell 5.5 percent, from $250.03 per share at prior close to close on July 24, 2014 at $236.21 per share.

115.    The truth was starting to be revealed.  As pullin transactions could no longer cover up earnings misses, or even get PCP close enough to avoid negative investor reaction, the reality that long term issues may be the cause started to bubble up.

116.    But PCP immediately made further misrepresentations, via way of further assurances, to prevent the full revelation of the truth.

117.    On July 24, 2014, after confirming that Rolls-Royce was still destocking, Donegan – again – assured investors that it was temporary, stating that "we do definitely see that coming to an end." Despite the disappointing financial results, PCP remained adamant on the call that destocking was "starting to go away" and that demand was on the horizon. Donegan also

"reaffirm[ed] the [2016 EPS] target" and assured investors that "the framework is in place" to meet the target. These reassurances served to staunch the bleeding in the stock, and prevented the full truth from being revealed.

118. PCP continued to blame destocking for its poor earnings results as the year progressed. On October 23, 2014, PCP issued a press release announcing its second-quarter fiscal 2015 financial results, which again missed analysts' earnings estimates.

119. On news of this earnings miss, PCP's stock price fell 0.95 percent, from prior close of $226.20 per share to close at $224.06 per share.

120. On an earnings conference call held that same day, the Company again attributed its disappointing earnings results in part to "destocking primarily by a single engine customer," which the Company explained, "negatively impacted Forged Products' growth overall by 2.5 percentage points."

121. Demonstrating a sense that only part of the truth was being revealed, analysts questioned Defendant Donegan on the continued impact of destocking and asked how much longer the Company anticipated it to be an issue. In response, Defendant Donegan continued to assure investors that "there is no change" to the Company's 2016 EPS targets, and that destocking was temporary and that demand would soon return:

> I would agree with you that we have been talking about it for a long time. I would tell you that right now the schedules that we have on us says that it ends and starts to recover in our Q4 and fully recovers in Q1. We have orders on us that say that. And at this point in time that all I can go for.

> But I would agree with you. It has been a redo with this customer probably two to three times it has been. I do believe that it is getting to the point that it cannot be reduced anymore. So I guess I'd say that my confidence at this point in time is higher that it will, in fact, stick to the current schedules than it has in the past.

I.     **The Truth is Finally Revealed; and PCP Stock Declines**

122.    The extent of the serious and long-term decline in the Company's business was fully revealed on January 15, 2015, when PCP issued a press release that preannounced missed third-quarter fiscal 2015 sales and earnings. The Company continued to blame "further aerospace engine destocking at a single customer" for the disappointing financial results. Specifically, the press release stated:

> Precision Castparts Corp. (NYSE:  PCP) announced today that lower demand in oil & gas end markets, ***further aerospace engine destocking at a single customer***, year-end customer inventory management actions, and an extended equipment upgrade negatively impacted the company's third quarter fiscal year 2015 sales and earnings. The combination of these factors leads the company to expect that third quarter sales will be in the range of $2.42 billion to $2.47 billion and earnings per share (EPS) from continuing operations (attributable to PCC) in the range of $3.05 to $3.10 (diluted).

> Late in the third quarter of fiscal 2015, the company saw demand deteriorate from its oil & gas distribution customers. Additionally, previously discussed destocking at a single commercial aerospace customer and calendar year-end customer inventory management actions had a greater impact on the third quarter than had been anticipated. Also, a key asset had an unexpected extended recovery following an upgrade. These factors most meaningfully affected Forged Products' results, and Airframe Products was affected to a lesser degree by customers' year-end inventory management actions.

> "Despite these challenges, the momentum in our aerospace business continues, and we have already begun to deliver the inventory deferred in the third quarter and expect to realize those sales in the fourth quarter," said Mark Donegan, Chairman and Chief Executive Officer of Precision Castparts Corp. "The equipment that was upgraded is now up and running and fully functional. Looking forward, PCC has strong technical expertise in the oil & gas markets and is pursuing new awards; however, those markets are clearly full of uncertainties at the moment. Regardless of these challenges, we are positioned for growth across our markets and expect to leverage that growth effectively over the long term."

123.    On this news, PCP's stock price declined from prior close of $219.72 per share to $199.63 per share at close on January 16, 2015, or 9.1 percent.

J.   **Investors Learn That 'Temporary' Destocking Was A
     Smoke Screen**

124.   Analysts immediately realized that the "temporary destocking" that had long been
cited by the Company was not the actual cause of PCP's poor financial results. Instead, the
market belatedly learned that PCP was structurally losing business from both Rolls-Royce and
other customers, and that the Company's "organic growth" may have been illusory. For example,
in a report titled "So Much for Visibility," Credit Suisse expressed "surprise" and, ultimately,
disbelief at the Company's continued insistence that its financial woes were due to temporary
destocking and further predicted that the recent miss "may be the last straw on the proverbial
back of the camel for some":

> Another surprise is continued destocking (the absence of ordering) from a single
> aero engine customer (likely Rolls) that was supposed to be improving (coming to
> an end during FQ4 and abating entirely by FQ1), another point that was
> reaffirmed at our conference. ***Based on yesterday's announcement, it's clear to
> us that is not the case, and we still wonder if there is some share loss here***.
>
> ***Investors were already struggling with PCP's earnings reliability over the past
> several quarters, so last night's news may be the last straw on the proverbial
> back of the camel for some.*** They might now conclude that this management
> team, which claims to have fairly good visibility, if not a keen sense of timing, is
> really dealing with a shorter cycle business that we thought.

125.   JP Morgan also issued a report on January 16, 2015 that questioned the
Company's representations about the causes of its recent earnings misses:

> Disappointing organic growth has been the key issue behind EPS missing
> consensus now in eight of the past 11 quarters. There are a number of reasons
> why organic growth has not matched the level that PCP's end-market exposures
> imply, ***but we have had trouble understanding the full extent of the shortfall,
> and this miss should increase concerns about whether there is a larger problem
> – we have wondered about share loss, but management insists this is not the
> case – and stoke further doubts about the company's ability to grow
> consistently***.

126.   Additionally, analysts understood that, contrary to Defendants' prior
representations, the Company's 2016 EPS target was in jeopardy. For example, in lowering its

PLAINTIFFS' COMPLAINT                    33

price target from $276 to $242 and lowering its rating from "Buy" to "Hold," a Canaccord analyst noted that: "We believe these issues also will impact the prior $16.00 in EPS in fiscal 2016 guidance the company had provided, creating an additional overhang." Similarly, Cowen & Co. issued a report on January 16 stating: "On the 1/22 earnings call, we expect PCP to quantitatively reset, or at a minimum, qualitatively talk down its F16 EPS target of $15.50-$16.50 before cash deployment." A Deutsche Bank analyst report issued the same day also noted that PCP's 2016 targets "seem even less achievable to us than they did previously."

127.    In a January 20, 2015 report, JP Morgan further questioned whether destocking was the actual cause of the Company's poor earnings results, or whether something more significant was to blame:

> The lower than anticipated sales to a single customer widely believed to be Rolls-Royce was an issue yet again this quarter, and [Precision] continues to classify it as destocking. After speaking with the company, we believe that sales to [Rolls-Royce] declined sequentially and may have declined more y/y than they did last quarter. ***This issue has been persistent and management forecasts that it will recede have been premature. [Precision] insists it is not losing share, as it has LTAs that stipulate market share on specific part numbers, but we wonder if perhaps [Rolls-Royce] is fulfilling its commitments in a way that has led to share transfer from [Precision] to Firth Rixson/Alcoa over the course of the LTAs and as Firth's new Georgia plant has expanded its operations.***

## K.    Defendants Belatedly Confirm that They Misstated and Omitted Material Facts

128.    On January 22, 2015, PCP confirmed that, despite its repeated assurances for more than a year, the 2016 Numbers were not achievable. During a conference call held for analysts and investors that same day, Defendant Donegan and Jay Khetani, PCP's Vice President of Investor Relations, also announced that PCP was revamping the way in which it communicated to investors and admitted that investors had not been timely provided with material information that called into question the Company's ability to meet the 2016 Numbers. For example, in describing PCP's new framework, Khetani stated:

I think A, it's a one-year time frame with a set of sensitivities and assumptions stated, *which you didn't have insight into our original FY16 discussion. We also went two years without updating, so things changed during that time frame.* Clearly, as we talk each quarter to you going forward, we will essentially update for changes that occur there. *I think the entire structure of what we're doing going forward will look nothing like how we've handled it in the past.*

129.    During the call, analysts expressed consternation over the fact that these EPS estimates "were still reiterated within the last six months." In response, Donegan stated that he "accept[ed] the responsibility wholeheartedly" for PCP's communications failures during the Relevant Period.

130.    These admissions struck at the core of the assurances PCP had previously provided, and that the market had already concluded were false.  In admitting that they failed to update the 2016 Numbers for two years, despite "changes" – but still not admitting or providing insight into the pullin transactions that were done to keep up appearances – PCP undermined its assurances going back to the start.

131.    Also during the call, Defendant Donegan admitted that PCP actually had no visibility into when what they called customer destocking activity would end, stating that he was "hesitant to tell [investors] it is at the end," and that he is "*assuming* that a single customer who has been de-stocking continues that activity."

132.    These post-applicable-disclosure statements corroborate what the market had already concluded: the short term destocking was nonsense; PCP had fundamental, long term problems due to structural declines in demand for its products.

133.    In a January 23, 2015 analyst report, JP Morgan pointed to further "datapoints" suggesting that Rolls-Royce was in fact directing business to PCP's competitors:

Management continues to characterize lower sales to one particular aero engine customer, widely believed to be Rolls-Royce, as destocking, and this remains a significant headwind even after two years. The latest shift downward came during last quarter and management has indicated that there are incremental sequential

headwinds in Q4 and the schedule for calendar 2015 was recently lowered, so this issue should persist well into a third year. Management remains adamant that PCP is not losing share, citing that declines on parts where they are clearly the sole source are consistent with those where there is competition. This may be the case but *we have a hard time getting past the fact that the competitive landscape looks tougher and there are many other data points that strongly suggest that Rolls is directing business elsewhere*.

134.    Analysts' assessment that PCP was losing Rolls-Royce's business to competitors was reinforced on January 28, 2015, when PCP competitor Universal reported its fourth-quarter 2014 earnings results. On the related earnings conference call, Universal CEO Dennis Oates maintained that any destocking he had seen in the industry had long been over, and explained:

> [W]e are not seeing any [destocking], in our view *destocking [ ] basically ceased a year ago* and we've seen continuous good activity there. . . . Our targets have all been met. Where we've had agreements and had some estimations of what our sales should be in 2014- I think we published for example on Rolls-Royce that we would expect to see $4 million to $6 million of incremental revenue from Rolls in 2014, and I believe we're $4.3 million, so we're in at our low end of the range. But fundamentally we're within the bracket that we felt we would get.

135.    The fall in PCP's stock price during the Relevant Period as a result of the corrective disclosures was no fluke.  Having traded in a general band of $220-250 per share during the Relevant Period, when inflated, PCP traded in a general band of $190-210 afterwards, until a deal at depressed prices reinvigorated the Company's stock.

**L.    PCP is Acquired by Berkshire Hathaway**

136.    In July 2015, Defendants Donegan and Hagel met with Berkshire Hathaway Chairman and CEO, Warren E. Buffet, to discuss the Company's performance. Berkshire Hathaway became a PCP stockholder in 2012. The day after the July 2015 meeting, Defendant Donegan was informed that Mr. Buffet was interested in acquiring the Company.

137.    Merger negotiations followed, and, on August 10, 2015, PCP and Berkshire Hathaway issued a joint press release announcing that they had entered into a definitive merger

agreement, whereby Berkshire Hathaway would acquire each share of PCP stock for $235.00 per share in cash.

138.    On October 22, 2015, PCP issued a press release in which it announced its second-quarter fiscal 2016 earnings, which again missed consensus estimates. In light of the pending transaction with Berkshire Hathaway, the Company announced that it would not hold a conference call and would not be issuing updates to its annual guidance. The October 22, 2015 earnings announcement was PCP's last earnings announcement before it was acquired by Berkshire Hathaway.

139.    On January 29, 2016, Berkshire Hathaway's acquisition of PCP closed. Because PCP is now a wholly owned subsidiary of Berkshire Hathaway, the Company no longer issues its own earnings results, and Berkshire Hathaway does not report PCP's numbers separately. As a result, investors no longer have visibility into PCP's revenues.

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

140.    Numerous additional facts give rise to the strong inference of scienter that, throughout the Relevant Period, Defendants Donegan and Hagel knew or were severely reckless in disregarding that (i) the negative impact of Rolls-Royce's inventory reduction was not temporary, (ii) PCP was losing business and suffering weakened demand for its products, and (iii) the Company's undisclosed practice of "pulling in" sales was not sustainable.

141.    First, interviews with former PCP employees confirm that pullin transactions were occurring, and, more importantly, that pushing sales into the existing quarter, cannibalizing future orders, was common, widespread, occurring in multiple PCP subsidiaries and was indeed corporate policy.   Defendant Donegan knew, or should have known, that such activity was occurring.

142.    Second, confidential witness information in the Class Complaint confirms the existence of pullin transactions, and that Defendant Donegan knew or recklessly disregarded that the Company was experiencing weakened demand for its products and that this softness was not the result of temporary inventory destocking.

143.    Further, even if Defendant Donegan did not know that PCP was losing business to competitors, he was at the very least reckless in representing that he knew the decline in sales was temporary and that the Company was not, instead, losing market share on a permanent basis. As the Company admitted in January 2015, it had little basis for the destocking claims.

144.    Third, Defendants Donegan's and Hagel's knowledge of weakened demand for PCP's aerospace products, specifically with respect to Rolls-Royce, can be inferred because these facts are critical to PCP's core operations. Not only does PCP rely on the aerospace market for 70 percent of its total sales, but the Company itself refers to Rolls-Royce as one of its "key customers." Knowledge of Rolls-Royce's weakening demand for PCP products and of PCP's loss of business can therefore be inferred. What is more, Defendant Donegan's own public statements confirm that PCP executives regularly monitored the Company's market position.

145.    Fourth, during the Relevant Period, the Individual Defendants reviewed, approved, and signed PCP's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein (the "SOX Certifications"). These SOX Certifications purported to confirm the accuracy of the financial statements and stated that the Company had designed effective internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The SOX Certifications also confirmed that the information in the Company's SEC filings "fairly present in all material

respects the financial condition, results of operations and cash flows of the" Company. Because, as detailed herein, the Company's financial statements issued during the Relevant Period contained false and misleading statements, the SOX Certifications signed by the Individual Defendants were materially false and misleading.

146.    Fifth, Defendant Donegan and Hagel engaged in suspicious stock transactions at times when PCP's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. Specifically, between May 13, 2014 and May 14, 2014, Defendant Donegan exercised options to purchase 89,752 shares of PCP common stock (nearly 40 percent of the 226,258 shares he owned at the time) at a price of $101.41, for a total of $9,101,750. Defendant Donegan immediately sold those shares at prices between $253.03 and $254.76 per share, for a total of $22,858,867, and thus instantly recognized a profit of $13,757,117. Further, on November 27, 2013, Defendant Hagel exercised options to purchase 25,000 shares at $101.41 per share, and immediately sold those shares at $259.93 per share, recognizing an instant profit of $3,963,000. Prior to this option exercise, Defendant Hagel directly owned just 19,899 shares of PCP common stock. Importantly, all of these options were not set to expire until late-2018 or late-2019, demonstrating that Defendants Donegan and Hagel did not need to exercise them when they did and further supporting the suspicious timing of these stock transactions.

147.    Sixth, according to the Class Complaint, a Rolls-Royce procurement executive called a PCP executive saying "You did not tell us about destocking, what is destocking? What the hell are you talking about?" – the *very* client PCP was attempting to blame for its supposedly temporary issues informed PCP that this was not the case.

148.    Seventh, the Company's post-Relevant Period admission that PCP needed to, and was, revamping the way in which it communicated to investors and associated admission that

investors had not been timely provided with material information that called into question the Company's ability to meet the 2016 Numbers.

149.    As a senior executive, Defendant Donegan's knowledge is attributable to defendant PCP.  As a senior executive, Defendant Hagel's knowledge is attributable to defendant PCP.  In addition, information independently determined by Plaintiffs, pled above, as well as information from the Class Action Complaint, shows that the use of pullin transactions was not random or one-off, but was a concentrated corporate policy being communicated to PCP employees from PCP management – knowledge of corporate policies, such as the use of pullin transactions, is attributable to the Company.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Pre-Relevant Period: the First Quarter Fiscal 2014 Results & The Destocking Explanation

150.    On July 25, 2013, the Company issued a press release announcing its first-quarter fiscal 2014 ("1Q14") financial results—*i.e.*, its results for the quarter ended June 30, 2013. In that press release, Defendants reported record EPS of $2.88 from continuing operations, and touted PCP's growth prospects, including 1Q14 results and trends that purportedly would allow PCP to achieve the organic growth and fiscal 2016 EPS target it promised. For example, that release disclosed:  "*Like Investment Cast Products, the [Forged Products] segment supported commercial aircraft production at levels consistent with aircraft build rates and will benefit from similar upside opportunities as commercial OEMs ramp production, and new aircraft and engine development programs progress*."

151.    That release also quoted Donegan as stating the following:

We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs…

*Looking ahead, we have secured solid positions on all major production and development commercial aircraft programs, and our casting and forging operations will ramp up or level out as the OEM schedules dictate…*

*Beginning in the back half of calendar 2014, many of our operations will be ramping up to handle increased volumes, as the new aircraft and engine development programs roll out.*

152.    During the Company's July 25, 2013 earnings call, Donegan for the first time cited "*modest destocking*" by some of PCP's engine customers leading to reduced current demand, but downplayed these issues by assuring investors that they were temporary, that long-term demand had not declined, and that organic growth was poised to improve.

153.    For example, with respect to PCP's aerospace business, Donegan reported in his opening remarks that the business was growing and would continue to grow, notwithstanding temporary "modest" destocking and demand reductions by some of its key engine customers, such as Rolls-Royce. Specifically, he stated:

[W]e had overall growth of 30% versus last year….Our base sales were flat.…*We have seen some modest de-stocking by some of our engine customers but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply an inventory realignment that we experienced and the demand does show back in the future.*

\*        \*        \*

*Looking forward [in the Investment Cast Segment], again we've established that new current levels on the base business a future demand, we have to handle as the rate increase is still intact. We have to step up to the 787 and the 737 increases. And we are very well-positioned on the new engines, both the LEAP and the Geared Turbofan.* We have very aggressive schedules that we have to support into fiscal year '15 and then rapid ramp-up following that two years. So our share gain, the positions, the demand is going to be a certainly challenging but puts us in a very solid position on the re-engining.

\*        \*        \*

Forging has also won a very solid position on the LEAP and the Geared Turbofan. They face the same aggressive demands as Castings on both the development and the production ramps as we enter into next year.

\*      \*      \*

Looking forward, in Investment Cast Products in aerospace we are well-positioned for the rate increases of the 787 and the 737. We have very strong penetration, as we said in the LEAP and the Geared Turbofan. We have to support that aggressive development in our late '14 and through '15…

\*      \*      \*

***In Forged, . . . . [t]he OEM dynamics in aerospace are very similar both in terms of matching current rates and having the support the growth of the two engines, as Investment Cast.***

154.    Analysts sought clarification from Defendants on the scope, timing, and impact of the destocking issue that Donegan mentioned in his opening remarks, given the potential for it to restrict PCP's organic growth and prevent it from reaching its EPS target. For example, Donegan and concerned analysts engaged in the following back and forth in which Donegan downplayed concerns and rejected the notion that destocking could impact PCP's revenues for 12 to 18 months:

[Joe Nadol (JPMorgan Chase & Co. analyst):] Mark, the de-stocking you're talking about that you're seeing, is it multiple customers or is it one major engine customer? What do you think is behind this? Is it after market related on their end or what's driving it? And then you say it might last a couple quarters, two or three quarters. ***Typically these things tend to last a little longer than that. I would say 12 to 18 months, if it's a real de-stocking cycle. What gives you the sense that is really only couple quarters?***

[Donegan:] ***Maybe de-stocking is not the proper terminology. It is at a couple engine primes and it appears to be a inventory reduction in this calendar year.***

***And why say that is, we do see the demand sitting in our Q4 [i.e the quarter ended March 31, 2014]. So if I look at what it wants to do, it wants to remain stable and then it wants to jump up in Q4.***

***Our challenge will be to go back and say we can't jump up in that manner. It has to be spread out. So do I think it's anything longer than that? No, I do not. It appears to be just an inventory, or whatever reasons, in very specific time frame that does want to re-accelerate going into next calendar year.*** So does appear to be a yearly number, not some general spares or follow-up. It does appear to be an inventory objective.

[Joe Nadol (JPMorgan Chase & Co. analyst):] When you look at that part numbers and the types of parts, it seems like you have visibilities at the other end of it that would schedule filling up in the fourth quarter, your fourth quarter. Do you get the sense that it's one or two types of engines? Or is this really broad-based?

[Donegan:] I'd say that it's falling into a couple different categories. On the material side obviously we don't – if I look at the Canon, that's going in to some of the engine primes. I don't know exactly what engines it's going into, but it's not a broad swept across everything. It is more of a specific realignment in two or three engine types. So it's not like an overall reduction of X percent. It does appear to be very specific.

The other thing I would add to that too, is it's not dragging out of us. The metal side did for a quarter, but that recovers back almost this quarter.

**It really is just that growth that we're seeing wants to reside in Q4 and Q1.** Take a step up, we're just trying to claw and pull back into this particular period. Like I said, it appears to be an inventory-related on a very specific target on a couple programs.

*       *       *

**[The destocking/inventory reduction is] actually on new [engine] programs. So I think that on some of the new platforms there has been so many starts and stops, starts and stops, that I think we're seeing that inventory realignment there. It is not the older programs. So from our vantage point it's not the retirement. It is the newer platforms.**

155.    Analysts also questioned whether the Company would still experience organic revenue growth, what organic growth would occur over the next year, and whether PCP would meet its fiscal 2016 EPS target, particularly given Donegan's indication that there would be a few more quarters of aerospace engine destocking. Donegan assured investors that growth will "**gain a lot of steam**" in the next couple of quarters, and that the Company was on track to meet its 2016 guidance. He also rejected that the "destocking" could actually represent a longer-term decline in demand, stating that "**I don't think it will be worse at all because … we've seen what the [destocking] customer wants.**" For example, the following exchange occurred:

[Noah Poponak (Goldman Sachs analyst)]:  Mark, I wondered if you might be willing to, at least attempt to, quantify what you think total Company organic

revenue growth is going to look like for the full year. Because it sounds like a few more quarters of this aerospace engine de-stock, a few more quarters of IGT not really changing, a little bit more impact from the press. And it's negative in the first quarter. It sounds like, all-in it's going to be difficult for it to be much different than flat for fiscal '14. And then, if I could take you out a little further into the future, if that is true, *in order to get into your previously-stated longer-term fiscal '16 target the '15-'16 organic [growth] looks like it needs to really step up into the low double-digits or even mid teens to get into that. Is that really the more L-shaped pass that we're looking at here, or am I missing something?*

[Donegan:] [I]t becomes somewhat difficult, the way I think of it, going out to the '16 number is either with more volume, performance. I've got to get a drum beat of what I need to put through quarter over quarter over quarter, in terms of EBIT dollars. *If I look at Q1, we're pretty much on that drum beat.* It becomes difficult because there are many moving pieces.

*Now let me answer the two- or three-quarter – I think that we are – what I'd like to see it be, 1.5.* My goal is, I can't, I'm going to struggle to step up in the manner at which they want it to do. *So again, the fact that it looks like it isn't inventory goal, the demand is there.* And they want to step back up in my Q4. Obviously I'm going try to pull it back.

So let's say metals are a constant. Let me I can answer the question from that standpoint. *Metals are a constant. Then I would expect to see that organic growth come our Q4, to start to pick up from that standpoint as it comes through. But I do not look at this a, I only get it one way.* Again, I look at it as, I get to generate EBIT dollars at a rate over the next two years and three quarters, either through operational improvement, more volume, organic growth, new product introduction, new engines. It doesn't matter to me where I get it from. I have to get it. *And if I look at where we were in Q1 from Q4, we're on that slope. We are on that slope.*

\*        \*        \*

Does it make your job any easier? No, it doesn't because you – I understand. I understand you're trying to find the A plus B equals C. I have A, B, C, D, E, F, I get all these dynamics that I get to incorporate into mine. So I really focus on that EBIT dollar improvement, is kind of the way I think of it. Quarter over quarter over quarter. I relate that in every quarterly review... *Either organically or performance, that's what I'm expecting*.

\*        \*        \*

[Noah Poponak (Goldman Sachs analyst)]:  It does sound like, without quantifying it, directionally the next couple quarters, excluding metal price movements, are closer to flat organically, with a step up in 4Q and continuing into '15.

[Donegan:] Yes, I would say that, when you get into these inventory movements, there tends to be some unpredictability. I'd say CYC today, *next couple quarters you are probably right, and then it wants to gain a lot of steam*. Again, it moves. When you get these – it's not as though it's necessarily the market doing anything, the end market, but it can be more volatile. *I don't think it will be worse at all because I think that we've seen what the customer wants*. Sometimes it can be the opposite effect. So that's kind of what I would feel at this point in time.

**B.    The Relevant Period Begins: The First Quarter Fiscal 2014 10-Q is the First Filing to Affirm the Temporary Destocking Explanation**

156.    On August 8, 2013, PCP filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2013 ("1Q14 Form 10-Q"), which was signed by Hagel. The Company's Form 10-Q reaffirmed the financial results and outlook announced in the July 25, 2013 press release and earnings call.

157.    For example, the 1Q14 Form 10-Q disclosed, that "*The Airline Monitor is projecting further growth in aircraft deliveries in calendar year 2014, and therefore we anticipate that our aerospace sales will increase in the latter quarters of fiscal 2014.*" That Form 10-Q also disclosed:

- *"The Investment Cast Products segment is solidly positioned to benefit when build rates accelerate on key platforms, and new aircraft and engine development programs advance, however, nearterm aerospace sales growth may be moderated by continued engine customer destocking."*

- *"Similar to the Investment Cast Products segment, [the Forged Products segment] aerospace OEM business continues to be aligned with current commercial aircraft production rates…[and] is positioned for further aerospace growth when commercial OEM production ramps, and new aircraft and engine development programs advance."*

158.    The statements above were materially false and misleading when made because:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce,

inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)     PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)     PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)     The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue for the foreseeable future to curtail, the organic growth and EPS target that Defendants assured investors would occur –

destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)     The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)     In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)     As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

159.    The 1Q14 Form 10-Q included risk disclosures stating:

> ***Our business is dependent on a small number of direct and indirect customers.***
> A substantial portion of our business is conducted with a relatively small number of large direct and indirect customers, including General Electric Company, United Technologies Corporation, Rolls Royce plc, Airbus and The Boeing Company. General Electric accounted for approximately 15 percent of our total sales for fiscal 2013. No other customer directly accounted for more than 10 percent of total sales; however, Boeing, Airbus, Rolls Royce and United Technologies are also considered key customers. A financial hardship experienced by any one of these key customers, the loss of any of them or a reduction in or substantial delay of orders from any of them could have a material adverse effect on our business.
> In addition, a significant portion of our aerospace products are ultimately used in the production of new commercial aircraft. There are only two primary manufacturers of large commercial aircraft in the world, Boeing and Airbus. A significant portion of our aerospace sales are dependent on the number of new aircraft built by these two manufacturers, which is in turn dependent on a number of factors over which we have little or no control. Those factors include the demand for new aircraft from airlines around the globe and factors that impact

manufacturing capabilities, such as the availability of raw materials and manufactured components, changes in the regulatory environment and labor relations between the aircraft manufacturers and their work forces. A significant interruption or slowdown in the number of new aircraft built by aircraft manufacturers could have a material adverse effect on our business.

Sales to the military sector constituted approximately 12 percent of our fiscal 2013 sales. Defense spending is subject to appropriations and to political pressures that influence which programs are funded and which are canceled. Reductions in domestic or foreign defense budgets or military aircraft procurement, delays in funding or reprioritization of government spending away from defense programs in which we participate could adversely affect our business.

***Our business depends, in part, on the success of new commercial and military aircraft programs.***

The success of our business will depend, in part, on the success of new commercial and military aircraft programs including the Boeing 787, Boeing 737Max, Airbus A350, Airbus A320neo and F-35 programs. We are currently under contract to supply components for a number of new commercial, general aviation and military aircraft programs. Cancellation, reductions or delays of orders or contracts by our customers on any of these programs, or regulatory or certification-related groundings or other delays to any of these new aircraft programs, could have a material adverse effect on our business.

While the risk disclosures refer to the Airbus A320neo as a new commercial aircraft program on which PCP's success will partly depend, it is completely silent as to risks stemming from Rolls-Royce's then ongoing inventory reduction and rationalization initiatives and destocking. More specifically, these purported risk disclosures are completely silent as to risks stemming from PCP's undisclosed use of, and dependence on, unsustainable and aggressive pull-through sales practices and the risk that Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent PCP from pulling in sales to Rolls-Royce needed to achieve organic growth and PCP's fiscal 2016 EPS target.

160.    The risk disclosures alleged above also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls- Royce

business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. The 1Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

161.    The 1Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and

would indefinitely (if not permanently) prevent, PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

C.   **Citi Global Industrials Conference (Boston)**

162.   On September 17, 2013, the Company was asked to provide an update on engine destocking developments during the Citi Global Industrials Conference. When asked for an update "[o]n the engine de-stocking with the new programs that you talked about in the most recent quarter … and whether that March quarter still is the quarter where we get back on track," Donegan confirmed the destocking was "*temporary*" and would end by the end of the March 2014 quarter. Donegan explained:

> *Yes*. Again, the way I look at it, certainly we have – I guess I need to back up to – if you look at what makes us tick, what do we look for, *we have long-term contracts that are in play that basically guide and direct our market share, our pricing. Those are in place and those all have very strong content on*. And then you look at the rollout of the new programs, and *we have extremely strong, probably our best positions we've ever had on those new programs as they are rolling out.*

> We see off and on these – based on whatever a particular customer has, these moments where *they are just doing a temporary de-stocking*. Could be on the raw materials aside, could be on the components side. *And what it really is, is what we would see as an acceleration pauses for usually two to three quarter period of time.*

> I will say that where we are seeing that, it is playing out pretty much as our customers have told us it was going to go. *And as we go into Q4, Q1, we go back where that de-stocking goes away and comes back to the normal rates*.

163.   The statements made at the Citi Global Industrials Conference were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)     PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)     PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)     PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)     The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic

growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)    The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)    In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)    As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

### D.    Second Quarter Fiscal 2014 Results

164.    On October 24, 2013, the Company issued a press release announcing its second-quarter fiscal 2014 ("2Q14") financial results—*i.e.*, its results for the quarter ended September 30, 2013. In that press release, Defendants reported record sales of $2.36 billion, record EPS of $2.90 from continuing operations, and touted PCP's growth prospects, including financial results and trends that would allow PCP to achieve the organic growth it promised. That release disclosed:

- *"Going forward, **accelerated sales gains [in the Investment Cast segment] will be driven by further demand from production rate step-ups on existing platforms,** continued frequency of takeoffs and landings, and the segment's increased penetration on the new development engines*

> *for reengined narrowbody aircraft platforms, which are scheduled to ramp up quickly into full production."*

- *"Similar to Investment Cast Products, **the [Forged Products] segment is well positioned to benefit from ramps in commercial aircraft build rates** and the acceleration of the new re-engining narrow-body platforms."*

165.    Similarly, during the October 24, 2013 earnings call, Donegan reported that, going forward in the Investment Castings and Forged Products segments, "we will certainly see the benefit as the rate increases on the 787, and the 737 rate increases already announced." Donegan also touted the fact that PCP's 2Q14 results "***establish[] just another data point on a long road of steady expansion and shareholder value. This type of performance we and you should expect from the Company for the foreseeable future***."

166.    Analysts again sought an update on the destocking situation discussed in the prior quarter. Donegan provided the following update:

> [Noah Poponak (Goldman Sachs analyst):] Mark, it is a good quarter. The results look good and there is a lot of discussion about multiple opportunities in front of you. I wondered if you could maybe spend a minute on what you're concerned about in the near to medium term? ***But there wasn't a ton of discussion on the aerospace (inaudible) destocking that we started talking about last quarter. What is the update on that?***
>
> [Mark Donegan:] On the engine side of the equation, it think it is the casting world shows you – ***I think it has kind of remained at that stable level where we were. It certainly feels like that again, we said that as we move into Q3. I think that stable continuous***. And then as we get into that Q1, Q2, you start really having to handle that development load that we got to roll out on the reengineering, which is – puts quite a bit of pressure on us, and that standpoint, the rate of acceleration that wants to go. So that is what I would say from there.

167.    After the analyst followed up, noting that it sounds like the situation has not changed at all, Donegan explained:

> I think that it has held w[h]ere [it] was on that investment cast side of the equation. So that is all that it came through there.

*        *        *

[I]f you go back to what we said, we expected to see it stay at this [s]table level for our Q2 and Q3. And as we move the back half of four into one, that is when we start seeing that coming back. But it is important to note though that in that large commercial, we are seeing good demand from large commercial. Large commercial was in almost in that double digit territory. So it really is in that – we code it all together and investment cast products certainly is that military and that after market side of the equation.

168.    Donegan also assured investors that PCP was "positioned extremely well" to meet its EPS target of between $15.50 and $16.50 by fiscal 2016, although its 2Q14 results were not ahead of PCP's internal plan and destocking was negatively impacting, and would continue in the near-term to negatively impact, PCP's sales and organic growth by preventing the Company from inflating revenues by pulling in sales from future quarters above what was currently demanded by key customers, such as Rolls-Royce. More specifically, the following exchange occurred:

> [David Strauss (UBS analyst):] ***You mentioned that these results were just one data point on the long road toward your $16 target. Just curious, were the results actually ahead of your internal plan?***
>
> [Donegan:] No. The way … we think of this – the way I stack this up -- the contracts, the positions, the programs we have – ***we are positioned extremely well***. Now you come down to how can we digested it? How can we grow? How can we effectively manage the cost? So from our standpoint the way we think of this road, the way we think of this path, it is a continuum. So we don't – I just said we don't have the ability to make these giant pops. It's just we can't man, we can't move the product, we can get a (inaudible). So it will follow more of a – so when I think of it, I do think of it as a – we are very – our whole mindset – we always talk about staying on the line. You will hear from almost anybody in the Company, our whole world is staying on the line. We want to move products through on a line? Want to drive [verbal costs] through down the line. We want to – everything we do is that staying on the line drum beat. ***So we have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. So we hover around that line. So, no, this was not, from my vantage point, internally where we thought we could get – no. It wasn't that far off.***

169.    Similarly, Donegan rejected the notion that the Company's earnings target was being jeopardized by the fact that "sales have perhaps come in a bit light thanks to destocking," noting that "there are also elements in there that are ***outperforming*** what we originally thought."

Donegan further assured the market that "**when we say 'expect,' there [are] reasons as to why we expect**. We got a history and we know what we should get."

170.    The statements contained in the 2Q14 Press Release and associated earnings call were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)    PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)    PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)    The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact

that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)     The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)     In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)     As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

171.    On November 7, 2013, PCP filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2013, which was signed by Hagel (the "2Q14 Form 10-Q"). The Company's Form 10-Q reaffirmed the financial results and outlook announced in the October 24, 2013 press release and earnings call.

172.   For example, the 2Q14 Form 10-Q disclosed, that "The Airline Monitor is projecting further growth in aircraft deliveries in calendar year 2014, and therefore we anticipate that our aerospace sales will increase in the second half of fiscal 2014 compared to fiscal 2013." That Form 10-Q also disclosed:

- **"Sales gains [in the Investment Cast Products segment] are expected to be driven by further demand from production rate step-ups on existing platforms**, continued frequency of takeoffs and landings, and acceleration of the new development engines for re-engined narrow- body aircraft platforms."
- "Similar to the Investment Cast Products segment, [the Forged Products segment] aerospace OEM business continues to be aligned with current commercial aircraft production rates…[and **it is] well- positioned to benefit from expected ramp ups in commercial aircraft build rates** and the acceleration of the new re-engined narrow-body platforms."

173.   The 2Q14 Form 10-Q included risk disclosures materially similar the risk disclosures appearing in PCP's 1Q14 Form 10-Q.

174.   The statements above, including the risk disclosures, were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)   PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)   PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)      PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce— was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)      The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)      Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)      The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)    In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)    As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

175.    The risk disclosures in the 2Q14 Form 10-Q alleged above also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and (d) PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. The 2Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and

indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

176.    The 2Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

### E.    Credit Suisse Global Industrials Conference (New York)

177.    On December 3, 2013, during the Credit Suisse Global Industrials Conference, the Company was asked to provide an update on engine destocking developments, as well as PCP's organic growth outlook and fiscal 2016 EPS target and the extent to which engine destocking developments would negatively impact PCP's organic growth and EPS target. When asked for an update regarding "[w]hat has been the real driver behind that [Rolls-Royce engine destocking], and then as we get into the next calendar year, how should we expect that to play out," Donegan explained:

> I think that, again, there has certainly been, one of the engine guys [Rolls-Royce] has been very vocal about what they've been doing. ***I think the bottom line is***

*there was just a large amount of inventory that they put in the system as that, pretty much I would say that, main was a 787, was make sure that everything was protected. I think as it is now starting to balance itself out, I think it is mainly correction of that particular program.*

*So that is – I think – as we get into next year, our schedules show us done.* And we know it has to be gone because there is a – it's – the growth that we would have expected to see compared to – we are under-building to the current level. So I think as soon as that goes away, the schedule shows that coming back up.

So it has been more of – rather than destocking, a lot of times means you fall off. *It has been more of holding at a flat level, and not taking a step up. But I think that step up does start coming in, the middle of next year*.

But I think it was just basically, a bunch of inventories put in the system, to make sure that there was no misses when there was all the fluctuation of the 787.

178.    Donegan promised investors that the destocking would not prevent PCP from obtaining, or otherwise impact, its fiscal 2016 EPS target. Specifically, he explained that there are "other levers" he could pull to make up for any temporary destocking headwinds:

We are a linear thinking group of people. We are financially driven. Everything we do breaks down to a financial model.

Let there be no mistake, it breaks itself down to the core components. *So it is not a hope and a prayer*….

So our mindset is going to be linear. *You are going to see different movements. I did not circle – we did not get the acceleration from – because of the destocking.*

*You know what? We pull the other levers. We have got cost take-out, we have got these acquisitions. I know all those levers that are there.*

179.    The statements at the Credit Suisse Global Industrials were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

PLAINTIFFS' COMPLAINT                    61

(b)     PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e*., $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e*., Rolls-Royce;

(c)     PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)     The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)    The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)    In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)    As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

## F.    Third Quarter Fiscal 2014 Results

180.    On January 23, 2014, the Company issued a press release announcing its third-quarter fiscal 2014 ("3Q14") financial results—*i.e.*, its results for the quarter ended December 31, 2013. In that press release, Defendants reported record EPS of $2.95 from continuing operations, and touted PCP's growth prospects, including results and trends that would allow PCP to achieve organic growth it promised. In the release, Donegan explained:

> Our aerospace operations are supporting a historically high commercial aircraft build rate, and, as the customers take the rates to the next level, our sales should track that upward slope….During the quarter, we were hit harder than we have ever been before by last minute customer schedule shifts, and we do not expect to see them again to this degree in the foreseeable future….We came to grips with these late quarter challenges immediately, and we dealt with them as effectively as possible. Going forward, we see upside opportunities, and our operations continue to deliver increased value on higher volumes.

181.    Similarly, during the January 23, 2014 earnings call, Donegan reported that regarding the ***"forged [segment] and the outlook, if I look at aerospace, as with cast parts, it is***

***product that is contracted for, have in place, and will be driven as those rates increase.*** In this particular area, we will certainly also recover the Q3 schedule shift in Q4." Donegan also confirmed that the 2016 framework and forecast—particularly the fiscal EPS target of $15.50 to $16.50—remained intact, explaining:

> So on one hand, we are accelerating beyond those organic sequential growth ranges. As a benefit to the top line, it usually comes back on the downside when it comes to that range.

> This is how we think of our business. I want to make sure you understand. This is not guidance. This is clearly trying to define how we think of movement, quarter-to-quarter and sequentially.

> This is very consistent in the way we broke apart, defined, and gave the framework for our FY16. ***Contracts are in place. It is all intact. It was put there, to give that framework that, that this is how we kind of get there,*** and it is done in this manner.

> So I wanted to have that conversation, again, and the way we think about our business. Again, it is consistent with where we are in that 2016 framework. ***And that 2016 framework, looking at where the market is, and the contracts, and the price line, right now, that framework, it still feels very done, very – in the ability gap, so intact.***

182.   Analysts again sought an update on the destocking situation discussed in the prior quarter. Donegan and a Cowen and Company analyst engaged in the following back and forth:

> [Gautam Khanna (Cowen and Company analyst):] And then just, ***expanding on your comments on destocking into the year end. Does this extend beyond the 787 engine programs? And if you could update us on whether you still expect to be shipping in line on those programs with underlying consumption by the March, June quarters***, do you still expect – (multiple speakers)?

> [Donegan:] Yes, I think that – this I wouldn't even almost consider just – what the destocking I think there was, if I go through the course of mid last year, there was probably a realignment and a balancing, as the 787 started getting some drumbeat to it. So I think that there was a more specific – ***this to me felt more like a year-end shift***, moving product two to three weeks to the right, versus what would have come into some customers fiscal year end.

> ***So it did not feel like a destocking.*** It felt more like an objective, a cash flow, financial target, working capital, it felt like it was more of that. It just moved and

shifted, two or three days in some cases. It just got two or three days beyond our end.

**So going more in, if I look at kind of the remaining --what I consider the remaining destocking, it probably falls in a couple categories.** I think if falls into that fastener side of the business, and right now at the burn rates, and we do – and we can monitor the burn rates. The way that – we have the access to what they are pulling, we have access to inventory levels. So you can start to plot that crossover point. Again, that June through July/August, that is the quarter that we cross on that 787 hardware.

**And I think a lot depends on what is our end customer, basically in the case of the 787, as Boeing moves towards production of that 10, obviously I think they will keep pulling the Airframe side of the business. So I think that is the last piece of the puzzle. And then certainly the engine side, I expect to get pick up from the – as we are not at 10 yet on the engine side of business either. So as the true production goes to 10, I expect to see that come through, more in that our mid calendar year 2015,** so that is what it feels like today.

183.    Donegan also reiterated that PCP "**expect[ed] to see growth in the Q4 and Q1 [as these are] our quarters where we typically see that movement.**" He added:   "**Q4 has in it embedded growth….because there are demands coming from our customers**, and has it in it because we pick up three more manufacturing days. It has it in it, because we have been carrying some inventory, and it has it in it, because certainly, of these – this Q3 dynamic we got into."

184.    After a JP Morgan analyst asked whether "are there pluses and minuses to consider when we think about your [fiscal 2016 EPS]target," Donegan assured investors "**no, nothing has gone negative from that standpoint, in terms of the framework, not at all.**" A Citigroup analyst followed up, by asking "If we are sitting here 25 months from now and you don't reach the target, why would that have been the case?" Donegan indicated that it would not be due to any long-term impact from the "destocking" issue, explaining:

> Well, from my standpoint, why would it have been the case, is something fundamentally change with the overall dynamics, build rates didn't step up, something happened in the new product introductions, Yes, China melting down in terms of GDP, more macro dynamics. If you look at what our line of sight to is – again, my contracts are in place, I get share, I know what it is, the build rates are

announced. The engine people are marching down, the Framers are going at a pretty reasonable drumbeat right now.

Yes, there are some puts and takes – *the destocking, the destocking goes away. You close the gap. It has an end to it*.

185.     The statements contained in the 3Q14 Press Release and associated earnings call were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)     PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)     PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)     PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)     The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact

that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)    Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)    The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)    In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)    As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

186.    On February 6, 2014, PCP filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2013, which was signed by Hagel (the "3Q14 Form 10-Q"). The Company's Form 10-Q reaffirmed the financial results and outlook announced in the January 23, 2014 press release and earnings call.

187.    For example, the 3Q14 Form 10-Q disclosed, that **_"The Airline Monitor is_** **_projecting further growth in aircraft deliveries in calendar year 2015, and therefore we_** **_anticipate that our aerospace sales will increase in fiscal 2015 compared to fiscal 2014."_**

188.    The 3Q14 Form 10-Q included risk disclosures materially similar to the risk disclosures appearing in PCP's 1Q14 Form 10-Q.

189.    The statements contained above, including the risk disclosures, were materially false and misleading when made as:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)    PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (_i.e._, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, _i.e._, Rolls-Royce;

(c)    PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce— was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)     The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)     The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)     In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)     As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

190.    The risk disclosures alleged above also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls- Royce

business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. The 3Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

191.    The 3Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and

would indefinitely (if not permanently) prevent, PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

G.    **Fourth Quarter Fiscal 2014 & Full Year Fiscal 2014 Results**

192.    On May 8, 2014, the Company issued a press release announcing its fourth-quarter fiscal 2014 ("4Q14") financial results. In that press release, Defendants reported record EPS of $3.27 from continuing operations, record sales of $2.53 billion, and touted PCP's growth prospects, including results and trends that would allow PCP to achieve the organic growth it promised. In the release, Donegan explained: "***We have won major share on all current-production commercial aircraft programs, and the demand in that market continues to be very healthy.***"

193.    During the May 8, 2014 earnings call, Donegan agreed that "a 4% to 5% organic growth rate [was] doable in 2015 on the revenue side," explaining "[w]e are going to drive after every opportunity on every single aspect of this Corporation. So I think from that standpoint, yes, I feel really solid about kind of what we're looking at in this Corporation, absolutely."

194.    Donegan also reiterated that PCP was on track to meet its fiscal 2016 EPS target, confirming "we obviously feel very, very, very solid about kind of what's out there."

> Robert Spingarn (Credit Suisse analyst)]:  When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long term guidance range . . .What do you need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?
>
> Donegan:  You know typically we have a pattern that we will, when we under commit and over deliver. That's pretty much what our motto is from that standpoint.

*      *      *

*In terms of the whole, I don't know it's not guidance, the targets whatever you want to call it, I think what I would say is that we obviously feel very, very, very solid about kind of what's out there.*

195.    The statements contained in the 4Q14 Press Release and associated call were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)    PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)    PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce—was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)    The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that

these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)     Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur – destocking was not a temporary, short-term event, but rather part of a permanent, long-term structural decline in demand for PCP products;

(f)     The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)     In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)     As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

196.    On May 29, 2014, PCP filed with the SEC its Annual Report on Form 10-K for the fiscal year ended March 31, 2014 (the "2014 Form 10-K"), which was signed by Donegan and Hagel. The 2014 Form 10-K reaffirmed the financial results and outlook announced in the January 23, 2014 press release and earnings call, and disclosed materially similar information to what it disclosed in the 2013 Form 10-K and Form 10-Qs detailed above, including that

forecasted increases in aircraft deliveries would drive PCP's growth over the next year. The 2014 Form 10-K also included risk disclosures materially similar to those set forth above at ¶149 (*i.e.*, the risk disclosures appearing in PCP's 1Q14 Form 10-Q). The statements contained in the 2014 Form 10-K, were materially false and misleading when made for the reasons alleged above at ¶185.

197. The risk disclosures alleged above at ¶186 also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and (d) PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. That report's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

198.    The 2014 Form 10-K was also materially false and misleading because it failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been, preventing, and would indefinitely (if not permanently), prevent PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

## VII.    THE TRUTH BEGINS TO EMERGE

### A.    First Quarter Fiscal 2015 Results

199.    On July 24, 2014, the relevant truth and foreseeable consequences concealed by Defendants' misconduct and their false representations and omissions during the Relevant Period began to be revealed and/or partially materialized. On that date, the Company issued a press release announcing its first quarter fiscal 2015 financial results, which missed consensus estimates, and held a conference call regarding its earnings. For the market, this drop was the first evidence that the Company's promised strong organic growth needed to reach its fiscal 2016 EPS target was not materializing. Donegan attributed the lower than expected earnings to "some destocking that was occurring from some of the European customers [Rolls-Royce]."

200.    Analysts attributed the lower than expected results to the Company's inability to grow organically and continued destocking. Cowen and Company, for instance, noted that "sales

seem light" and "[i]f we remove Q4's $50MM of shipment catch-ups from the Q4 base, then organic sales appear to have risen by <1% sequentially. On prior calls, PCP mgmt has indicated that organic sequential growth should be close to 4% in FQ1."

201.    On this news, PCP's stock price fell 5.5 percent, from $250.03 at prior close to close on July 24, 2014 at $236.21 per share.

202.    Despite this partial disclosure of adverse news and/or materialization of an undisclosed risk that destocking was severely inhibiting the Company's ability to "pullin" revenue from future quarters, and thus its ability to meet fiscal year 2016 targets, the Company's stock price remained artificially inflated due to Defendants' continuous representations that destocking would soon come to an end and that the Company was still "on track" to meet its 2016 targets.

203.    Specifically, in an effort to contain the fallout from the Company's disappointing results, Defendants continued to tout PCP's growth prospects, including results and trends that would allow PCP to achieve the organic growth it promised. For example, PCP's July 24, 2014 press release quoted Donegan as stating the following:

> Our order books began to fill in rapidly, and customer demand for accelerated delivery increased. As a result, **we now have a clear line of sight to the steady growth we are anticipating in the second half of our fiscal year.**
>
> \*        \*        \*
>
> Commercial aerospace activity is and will continue to be the single biggest driver of our growth in fiscal 2015…. **Across the Company, base aircraft production continues to be solid. Production of 787 components in the majority of our aerospace operations now supports the original goal of 10 aircraft per month, and we now have orders in hand that will close the gap completely.** In addition, some Airframe Products' customers significantly accelerated their ordering activity during the quarter. These higher volumes, along with further share gains, are driving the segment's operations to take steps right now to be ready for the increased production that we can expect later this fiscal year.
>
> \*        \*        \*

> *Coming into the third and fourth quarters, we are looking forward to solid growth in all of our segments….*

204.    In a similar effort to comfort investors concerned about the Company's long-term prospects, during the July 24, 2014 earnings call, Donegan assured investors "[t]hat [destocking that impacted this quarter's results] *goes away and gives us a step up* [as we move into the back half of 2015.]" After a Cowen and Company analyst asked Donegan to expand on the inventory realignment/destocking issue, Donegan, for the first time, attributed the destocking to Rolls-Royce but remained adamant that the destocking was "starting to go away" and "coming to an end." More specifically, Donegan explained:

> *The destocking coming out of Rolls, yes. I'd say we do definitely see that coming to an end.* To be fair to Rolls, they've been pretty consistent when they said we were going to see it come to an end. And as we move into our Q4, that's when it comes to an end. Then the TIMET orders, again, that's that Rolls-Royce piece of the equation, that we do have the orders of this point in time on hand. It shows that going away.

205.    Analysts also inquired as to whether PCP was seeing a market share shift and aerospace business being directed to PCP's competitors. Donegan responded that "we do not."

206.    In another attempt to assuage investor concerns over the Company's long-term prospects, Donegan addressed PCP's 2016 targets, stating:  "*I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place.*"

207.    These statements left investors unaware that the Company was losing market share and Rolls-Royce's business to competitors, and that PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable and short-sighted practice of providing its aerospace customers, such as Rolls-Royce, with more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates. These statements also continued to mischaracterize PCP's disappointing results as attributable to a temporary destocking problem, and failed to disclose that the Company's results were being impacted, and

would continue to be impacted, because it was having to abandon the pulling in practices that it

had used with Rolls-Royce (among other customers) and driven its sales numbers for so long.

These statements also left investors with the impression destrocking was a temporary, short-term

event, when in reality it was part of a permanent, long-term structural decline in demand for PCP

products.

208.    By continuing to misstate and omit material facts, Defendants succeeded, to some

extent, in assuaging analyst fears. For instance, in a report issued on July 24, 2014, Wells Fargo

explained:

> While the company missed consensus EPS expectations by $0.03 (just 1%) due to
> a 3% top-line shortfall, *we believe the fundamental PCP thesis is entirely intact*:
> *Over the next several years PCP will benefit organically* from rising aircraft
> production rates (*e.g.*, 787, A350), meaningfully higher average aircraft content
> (*e.g.*, 737MAX), and an improving competitive position in power and energy
> markets.

209.    Similarly, in an article entitled "Market Loses Patience as Sales Upside Shifts to

the Second Half," Credit Suisse stated that the market had "appeared to overreact" to PCP's

latest earnings miss. Morningstar likewise parroted managements' pacifying remarks, stating

"*demand remains steady and visibility is high* as production-rate increases in aerospace are well

supported by immense aircraft backlogs at original equipment manufacturers."

210.    On August 7, 2014, PCP filed with the SEC its Quarterly Report on Form 10-Q

for the fiscal quarter ended June 30, 2014, which was signed by Hagel. The Company's Form

10-Q reaffirmed the financial results and outlook announced in the July 24, 2014 release and

earnings call, and disclosed materially similar information to what it disclosed in the Form 10-Ks

and Form 10-Qs detailed above. The 1Q15 Form 10-Q also included risk disclosures materially

similar to those set forth. The statements contained in PCP's 1Q15 Form 10-Q, were materially

false and misleading when made for the reasons alleged above.

211.    The risk disclosures in the 1Q15 Form 10-Q, as alleged above, also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and (d) PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. The 1Q15 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

212.    The 1Q15 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to

rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

### B. Second Quarter Fiscal 2015 Results

213. On October 23, 2014, the Company issued a press release announcing its second quarter fiscal 2015 financial results, which missed consensus estimates, and held an earnings call. Investors again were disappointed that Rolls-Royce's destocking was still cited as a headwind to organic growth months after it had stopped impacting the results of other Rolls-Royce parts suppliers. Specifically, Donegan disclosed during the earnings call that a "key driver [impacting aerospace sales] was destocking primarily by a single engine customer [Rolls-Royce,]" "[t]he value of that in the quarter negatively impacted Forged Products' growth overall by 2.5 percentage points," and "the destocking that went on from that single customer was a large number in the aerospace side of the equation."

214. Analysts expressed considerable concern over the Company's disappointing second quarter financial results. For example, Morningstar issued an analyst report on October 23, 2014 noting that PCP's results "are weaker than required for our prior annual projections" and that "prior growth estimates now seem too high." Similarly, Wells Fargo published a report on the same day noting that "PCP's long-awaited above-market organic growth story appears to be 1-2 quarters away," while KeyBanc Capital Markets acknowledged that "investor patience is wearing thin with PCP shares."

215.    On this news, PCP's stock price fell 0.95 percent, from a prior close of $226.20 per share to close at $224.06 per share.

216.    Despite this partial disclosure of adverse news and/or materialization of an undisclosed risk that destocking was severely inhibiting the Company's ability to "pullin" revenue from future quarters, and thus its ability to meet fiscal year 2016 targets, the Company's stock price remained artificially inflated due to Defendants' misrepresentations that destocking would soon come to an end, that demand was strong, and that the Company was still poised to meet its 2016 targets. For example, PCP's October 23, 2014 press release quoted Donegan as stating:

> *Going forward, our markets remain strong, and customer demand has given us a clear line of sight to sustained growth.*
>
> *                    *          *          *
>
> We have won solid share positions on all production and development programs in our key end markets…. *We have a strategic plan for growth, and we are steadily executing that plan.*

217.    During the October 23, 2014 earnings call, Donegan likewise provided false assurances to investors by reiterating the 2016 framework and EPS target, stating:  "*I want to make sure that it's clearly understood that we remain fully committed to our FY16 framework…. there is no change to the framework we laid out*." Further, Donegan cited "destocking that we experienced …that goes away" as one "factor[]…sitting on top of us now that certainly support that confidence" in PCP's ability to meet this target.

218.    In addition, when analysts expressed frustration that destocking was still impacting PCP's performance, Donegan assured them that the destocking was still just a temporary headwind that would not interfere with PCP's ability to meet its fiscal 2016 EPS target, and PCP was not losing market share. For example, a UBS analyst noted that the

"destocking that you talked about specifically at Forged, I think the 2.5% or whatever it was, ….
[i]t seems like we've been talking about this for quite a long time" and asked "how much further
can this go out of this customer?" Donegan agreed that "we have been talking about it
[destocking at Rolls-Royce] for a long time." He added:

> *I would tell you that right now the schedules that we have on us says that it ends
> and starts to recover in our Q4 and fully recovers in Q1.* We have orders on us
> that say that. And at this point in time that all I can go for. But I would agree with
> you. It has been a redo with this customer probably two to three times it has been.
> I do believe that it is getting to the point that it cannot be reduced anymore. *So I
> guess I'd say that my confidence at this point in time is higher that it will, in
> fact, stick to the current schedules than it has in the past.*

219.    After an RBC Capital Markets analyst requested additional details regarding the
destocking, Donegan provided the market with false comfort that the negative impact due to
destocking was coming to an end, stating:  "[A]ll I can answer at this point in time is the demand
we've seen, or *the destocking that we've seen, bottoms out and closes off in the Q3 time frame,
and then the orders on top of us start to recover*."

220.    Citigroup analyst, Jason Gursky, followed up on the "destocking customer," by
asking Donegan to "talk a little bit about the types of parts that this represents," address
whether "it [is] the same parts that we saw a year ago or we are now moving on to a different
set of parts," "describe your visibility into your other customers" and further asked "was this
particular customer just not managing their inventory well at all and they had a lot of room to
go." Donegan cryptically explained:

> A year ago we had multiple customers going through a destocking. It went
> through – we still are carrying over the destocking from the fasteners a year ago.
> There was castings that were in the destocking.
>
> This one tends to be, and has been throughout the course of this year, squarely
> aimed at the raw materials. So, you're looking at a billet or ingot, depending on
> what the particular product is. So, 10,000-pound round going in that's then
> subsequently sent out to a forger, or whatever it is. And you're looking at forged

components. So, you're looking at discs, rings, not rotating parts, inside a jet engine.

$$* \quad * \quad *$$

[T]he bulk of this is basically OEM related….I'd say probably 85% to 90% of the demand is going into OEM. It's not a high spares. It's not a turbine blade. Again, discs, rings, typically those tend to have a very low overall in repair.

$$* \quad * \quad *$$

I'll tell you, the signals over the last 12 months, the signals from the balance of our business have been very consistent. And they predicted, if I look at the fastener side of the equation, you look at the burn down rate, you look at what they say they are going to do, you look at how they have started ordering, look at the incoming order rate, they've been pretty predictable.

So, I'd say overall, the rest of the business, except for a Q3 dynamic, meaning some sort of cash flow inventory, no. I'd say the rest of the businesses have been well within reasonable as to what you'd expect something like that to do. So, no, I'd say it really is residing in one customer at this point in time.

221.    Each of the foregoing statements by Defendants were materially false and misleading when made for the reasons set forth above.

222.    In light of these continued misrepresentations and omissions, some analysts still believed that the Company could generate increased organic growth and achieve its 2016 EPS target. For instance, the KeyBanc Capital Markets report also noted that the "[d]estocking trend appears to have an end in sight," and "should begin to abate in fiscal 2H15 according to management." Wells Fargo agreed, relying on management's representation that the destocking issue "should be resolved during H2 2015." Moreover, S&P Capital IQ issued a report on October 23, 2014 stating that "we believe PCP is on track to hit its $15.50-$16.50 EPS goal for FY 16," while Canaccord analysts "[n]ote[d] that PCP reaffirmed its $15.50-$16.50 FY16 EPS guidance."

223.    Thereafter, on November 6, 2014, PCP filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2014, which was signed by Hagel. The

Company's Form 10-Q reaffirmed the financial results and outlook announced in the October 23, 2014 release and earnings call, and disclosed materially similar information to what it disclosed in the Form 10-Ks and Form 10-Qs detailed above. The 2Q15 Form 10-Q also included risk disclosures materially similar to those set forth above at ¶186 (*i.e.*, the risk disclosures appearing in PCP's 2014 Form 10-K). The statements contained in PCP's 2Q15 Form 10-Q were materially false and misleading when made for the reasons alleged above.

224.    The risk disclosures in the 2Q15 Form 10-Q, as alleged above, also created a materially false and misleading impression of the true strength of, and specific risks to, PCP and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCP from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCP's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCP's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCP's performance, and (d) PCP's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of PCP's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCP from further relying on such pullin sales practices. The 2Q15 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCP was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCP and

indefinitely reduce inventory purchased from PCP, thereby rendering the disclosed risks a then-concealed reality.

225.    The 2Q15 was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pullin sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCP from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, PCP failed to update investors on such changes.

## VIII.    THE FULL TRUTH IS REVEALED & OTHER POST-RELEVANT PERIOD EVENTS

226.    After the market closed on January 15, 2015, the Company shocked the market by preannouncing third-quarter 2015 sales and earnings, which once again missed consensus estimates at least in part because of the impact of Rolls-Royce's purported destocking. The release again attributed PCP's dismal performance and lowered expectations in large part to "further aerospace engine destocking at a single customer." More specifically, the release disclosed:

> Precision Castparts Corp. (NYSE:  PCP) announced today that lower demand in oil & gas end markets, further aerospace engine destocking at a single customer, yearend customer inventory management actions, and an extended equipment upgrade negatively impacted the company's third quarter fiscal year 2015 sales

and earnings. The combination of these factors leads the company to expect that third quarter sales will be in the range of $2.42 billion to $2.47 billion and earnings per share (EPS) from continuing operations (attributable to PCP) in the range of $3.05 to $3.10 (diluted).

*　　　*　　　*

[P]reviously discussed destocking at a single commercial aerospace customer and calendar year-end customer inventory management actions had a greater impact on the third quarter than had been anticipated.

227.    With these disclosures, the market finally recognized what Defendants had falsely denied throughout the Relevant Period:  that a sustained demand decline lasting nearly two years and costing the Company millions in revenues suggested a long-term reduction in market share rather than just "temporary inventory destocking." This belated realization cast a cloud over the Company's management, eviscerated the claim that the Company had successfully pivoted away from an acquisition-driven growth strategy, and led the market to understand once and for all that the fiscal 2016 EPS target, which Defendants had continued to affirm just one month earlier, was not obtainable and would need to be revised downward. The market reacted harshly. On this news, PCP's stock price declined by nearly 10 percent, from a prior close of $219.72 per share to $199.63 per share at close on January 16, 2015.

228.    Numerous analysts immediately recognized that this decline in PCP's stock price was (or would be) triggered by its January 15, 2015 disclosures, and they began questioning the credibility of PCP's management and their excuse that destocking at Rolls-Royce was the key reason for PCP's disappointing performance and lagging organic growth. For example, JP Morgan analysts published a report, dated January 16, 2015, in which they predicted that PCP's disclosure would cause a decline in its stock price, and expressed doubt and concern over PCP's destocking excuse, writing:

**PCP pre-announced a Q3 miss.** *We expect the stock to trade off as the miss exacerbates ongoing concerns about organic growth and should pressure*

*estimates.* Management cited oil and gas as a driver but only as one among several, indicating earnings would have missed even if oil and gas had performed as expected.

\*       \*       \*

Weak oil and gas sales are the first reason management offered for the miss and there may be a lot of focus on this item, given oil's place in the headlines. However, the oil/gas and other category was only 6% of sales last year and a significant chunk was minimally profitable work on large contracts with Aramco and Adnoc that are in the process of winding down anyway. Overall, oil and gas was therefore expected to be only perhaps a ~2% proportion of EBIT vs this 8% miss relative to our estimate. ***The other causes cited for the preannouncement are more familiar, and include one customer's multi-year destocking effort,*** broader customer inventory management around calendar year-end, and unscheduled equipment downtime, ***all of which have been reasons for organic growth shortfalls the past 2-3 years.***

\*       \*       \*

**Organic growth has been a persistent problem**. *Disappointing organic growth has been the key issue behind EPS missing consensus now in eight of the past 11 quarters.* There are a number of reasons why organic growth has not matched the level that PCP's end-market exposures imply, but ***we have had trouble understanding the full extent of the shortfall, and this miss should increase concerns about whether there is a larger problem – we have wondered about share loss, but management insists this is not the case – and stoke further doubts about the company's ability to grow consistently.***

\*       \*       \*

**Miss could pressure estimates further.** Some of the issues weighing on Q3, such as destocking, inventory positioning, and equipment outages, could be considered temporary in a vacuum. However, PCP has rarely recovered fully from past growth shortfalls, even those deemed temporary, and so we expect estimates to come under pressure.

229.    A January 16, 2015 Credit Suisse analyst report, bearing the headline "So Much for Visibility," expressed similar skepticism regarding the Company's destocking excuse, predicted that PCP's announcement indicated it would not achieve even the low end of its EPS guidance range and would cause its stock price to decline, and attributed the disappointing performance to a loss of market share:

*No sooner was the paint dry on our 2015 Outlook where we and our buyside respondents both selected PCP as our preferred commercial OE overweight, did the company issue its first formal profit warning in… forever* [ellipsis in original]. While it is not wholly unreasonable to be experiencing weakness in its oil and gas markets, there's more to this than that. First, we did not expect the O&G impact so soon, given fairly recent commentary from management in early December that these businesses were in a reasonably good state.

*Another surprise is continued destocking (the absence of ordering) from a single aero engine customer (likely Rolls) that was supposed to be improving (coming to an end during FQ4 and abating entirely by FQ1), another point that was reaffirmed at our conference. Based on yesterday's announcement, it's clear to us that is not the case, and we still wonder if there is some share loss here.*

**Not Just About Messaging Anymore:** While the magnitude of the profit warning is not huge vs. consensus (4.5% below Street sales to $2.42-2.47B, and 9% below Street EPS of $3.39, at $3.05-$3.10) – note we only measure against consensus because the company does not guide quarterly – *this name is already suffering from visibility/timing issues. Investors were already struggling with PCP's earnings reliability over the past several quarters, so last night's news may be the last straw on the proverbial back of the camel for some. They might now conclude that this management team, which claims to have fairly good visibility, if not a keen sense of timing, is really dealing with a shorter cycle business that we thought.*

*Thus, we expect shares to take a meaningful leg down today, likely a percentage similar to the 9% EPS shortfall*, and it may be difficult for a while for shares to catch a sustainable bid, not because the miss is so large (it really isn't), but because 1) there will be fear it can happen again, and 2) when annualizing the quarterly miss, one is challenged to achieve the low end of next year's guidance range of $15.50-$16.50.

230.    Robert Stallard of RBC Capital Markets similarly wrote on January 16, 2015:

PCP's share price was already feeling market pressure thanks to its oil & gas exposure (~$200m of sales, ~6% of the group), and so cuts here are not a huge surprise – even if they have come quicker than perhaps expected. *What we see of more importance is the continued destocking and inventory issues from aerospace customers. Our caution over this issue led to our downgrade in October – and we remain concerned that this will remain an issue until we get closer to the volume ramp on the LEAP X and GTF, helped by rate step ups on the 787 and A350.* This should come in 2H15, but the timing is difficult to predict. *PCP management has arguably been too optimistic on this issue given the actions of its customers in the past, notably at the same point last year.*

231.    Analysts further concluded that this long-term decline in demand had rendered the Company's 2016 EPS target unattainable. A Canaccord analyst noted that: "*We believe these issues also will impact the prior $16.00 in EPS in fiscal 2016 guidance* the company had provided, creating an additional overhang." Similarly, Cowen & Company issued a report on January 16, which reduced the price target for PCP from $270 to $219.72, stating: "On the 1/22 earnings call, we expect PCP to *quantitatively reset*, or at a minimum, *qualitatively talk down* its F16 EPS target of $15.50-$16.50 before cash deployment." A Deutsche Bank analyst report issued the same day titled "3Q pre-announcement continues the confidence erosion" noted that PCP's 2016 targets "seem *even less* achievable to us than they did previously," and reduced the bank's price target for PCP from $240 to $219.72

232.    On January 20, 2015, JP Morgan issued a report disclosing that it was lowering its estimates following PCP's third-quarter pre-announcement in large part due to the impact of, and uncertainties surrounding, continued weak sales to Rolls-Royce. More specifically, JP Morgan reported:

> *Weak sales to one key customer continue to plague PCP. The lower than anticipated sales to a single customer widely believed to be Rolls-Royce was an issue yet again this quarter, and PCP continues to classify it as destocking. After speaking with the company, we believe that sales to RR declined sequentially and may have declined more y/y than they did last quarter. This issue has been persistent and management forecasts that it will recede have been premature.* PCP insists it is not losing share, as it has LTAs that stipulate market share on specific part numbers, but *we wonder if perhaps RR is fulfilling its commitments in a way that has led to share transfer from PCP to Firth Rixson/Alcoa* over the course of the LTAs and as Firth's new Georgia plant has expanded its operations. *In any case, this issue should remain an overhang for Forged Products until we actually see the situation improve or better understand what is happening.*

233.    On January 22, 2015, PCP issued a press release announcing its third-quarter fiscal 2015 results and held a conference call regarding those results. During the call, Donegan confirmed what the market predicted following PCP's January 15, 2015 press release. Namely,

that the impact from the destocking "was not a small number"—between $40 and $50 million, and that "FY16 results will be below previously stated EPS targets of $15.50 to $16.50." During PCP's January 22, 2015 earnings call, analysts attempted to obtain clarity on the destocking issue, PCP's lagging organic growth, and its repeated target misses.

234.    For example, after an RBC Capital Markets analyst asked for Donegan's latest view on how long destocking will go on for, Donegan now disclosed he "would be hesitant to tell you it is at the end."

235.    Further, a Deutsche Bank analyst, who noted "obviously the last targets didn't go so well from your own perspective," asked:  "How do you approach giving guidance that is actually hittable? How do you change the way you externally communicate the business so that there's true alignment of expectations?" Dongean and PCP's Vice President of Investor Relations, Jay Khetani, responded by conceding that mistakes were made, indicating PCP's prior targets lacked any basis in fact, and effectively admitting that PCP's prior statements regarding its outlook and the impact of destocking, alleged above, were materially false and misleading. For example, Donegan explained:

> I think then we go back to what we did. The original goal two years ago basically, at this point in time, was to just provide a thought process based on where we saw the market at that point in time of what we thought the values business would be. It was certainly a long horizon. *I think number one, the first mistake was looking out at the time three years to say what we think this business can do. There's a lot of dynamics that can change. Number one, certainly it [our guidance going forward] will not be looking out that far.* We will target and we will go after a year.
>
> *       *       *
>
> *[Going forward,] we will provide what assumptions* – so we will have to make some assumptions on things like oil and gas. *I think that we will clarify as we communicate to you where we think some of that volatility may exist in terms of those assumptions. It will then be incumbent on us to either validate that our assumptions were right – they were better or worse.*

*I think that this whole – our whole mindset will now be clear to what is more solid against where is the risk in confirming where that risk is, or what assumptions we're making.* Now we're confirming on a three-month snapshot how's that year going to play out. I think that we'll be able to give a -- it's totally different dynamics, I think, from the standpoint.

236.    Khetani followed up on Donegan's statement by conceding PCP failed to provide, and investors thus lacked, sufficient insight into PCP's prior forecast for fiscal 2016, and PCP made no changes to its forecast/target to account for known changes in circumstances that rendered the target misleading during the Relevant Period. Khetani explained:

[The guidance/target that will be provided going forward will be] a one-year time frame with a set of sensitivities and assumptions stated, which *you didn't have insight into our original FY16 discussion*. *We also went two years without updating, so things changed during that time frame.* Clearly, as we talk each quarter to you going forward, we will essentially update for changes that occur there. I think the entire structure of what we're doing going forward will look nothing like how we've handled it in the past."

237.    The Deutsche Bank analyst, apparently not satisfied by Donegan's and Khetani's explanations, commented that "[s]ix months ago the targets were still reiterated and still confident. They were stated two years ago, but they were still reiterated within the last six months." This prompted Donegan to take responsibility for not providing sufficient information to the market in prior quarters, explaining:

*[A]t the end of the day, I got nobody to look at but myself.* Let there be no mistake that as we have thought this thing through, all of your questions have been fired at me by the group here, as well as looking at myself in the mirror. Number one, I understand the need clearly. *I accept the responsibility wholeheartedly. We will make sure that there is enough information to you that you will be able to understand the dynamics, and we will be able to communicate on a quarterly basis any changes plus or down to those dynamics. I think it will be different.*

238.    Following PCP's full third quarter release and earnings call on January 22, 2015, analysts noted that the financial impact of Defendants' January 22, 2015 statements confirmed facts that had been revealed to the market a week earlier, on January 16. For example, JP Morgan

noted in a January 23, 2015 report that its "estimates and price target are little changed following the full Q3 release from where we set them following last week's pre- announcement," while a Deutsche Bank analyst report issued on January 23, 2015 similarly noted that "[g]iven PCP's pre-announcement last week, the bad news was out" and the earnings call concerned the Company's "communication" and "predictability (or lack thereof) of their biz."

239.   Nevertheless, analysts continued to question, and express concern over, PCP's attempt to blame earnings misses and slow organic growth on destocking at Rolls-Royce. For example, JP Morgan wrote on January 23, 2015 that "Destocking remains difficult to understand," adding:

> ***Management continues to characterize lower sales to one particular aero engine customer, widely believed to be Rolls-Royce, as destocking, and this remains a significant headwind even after two years.*** The latest shift downward came during last quarter and management has indicated that there are incremental sequential headwinds in Q4 and the schedule for calendar 2015 was recently lowered, ***so this issue should persist well into a third year.*** Management remains adamant that PCP is not losing share, citing that declines on parts where they are clearly the sole source are consistent with those where there is competition. This may be the case ***but we have a hard time getting past the fact that the competitive landscape looks tougher and there are many other datapoints that strongly suggest that Rolls is directing business elsewhere. Regardless of the cause, understanding when sales to Rolls will stabilize is important for estimates.*** In May, management plans to reveal the degree to which this issue has kept the company from reaching its FY16 EPS target and it indicated that the magnitude of the impact would be surprising.

240.   Headwinds from Rolls-Royce's inventory reduction/realignment continued to negatively impact PCP's results and organic growth in the quarters that followed—further confirmation that during the Relevant Period, PCP was experiencing a permanent decline in demand, market share loss, and inability to drive growth by pulling in Rolls-Royce sales. For example, PCP disclosed that Rolls-Royce destocking negatively impacted aerospace sales and organic growth in the quarters ended March 31, 2015 and June 30, 2015.

## IX.    <u>LOSS CAUSATION</u>

241.    During the Relevant Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that artificially inflated the price of PCP's common stock by making false and misleading statements, and omitting material information, about the Company's operations, financial results and business prospects. These material false statements and omissions concealed numerous material facts from investors, including but not limited to the fact that (i) PCP's disappointing financial results during the Relevant Period were being caused by a ***permanent*** decline in demand resulting, in part, from at least one key customer's (Rolls-Royce's) inventory reduction initiatives, which prevented PCP from engaging in the undisclosed, unsustainable and short-sighted practice of pulling in sales to its aerospace customers by inducing them to take on more inventory than they required, and (ii) PCP depended on its ability to continually engage in this practice in order to achieve organic growth and its fiscal 2016 EPS target of $15.50 to $16.50. In addition, Defendants' false statements and omissions concealed from the market risks known or foreseeable to Defendants, including the risk that Rolls-Royce's inventory initiative would have an indefinite, if not permanent, impact on PCP's ability to generate revenue by pulling in Rolls-Royce sales, result in disappointing financial results, and prevent it from reaching its fiscal 2016 EPS target. As a result of Defendants' material misstatements and omissions, the price of PCP common stock was artificially inflated during the Relevant Period.

242.    As alleged herein, the artificial inflation in the price of PCP common stock dissipated on July 24, 2014, October 23, 2014, and January 15-16, 2015, as Defendants' false and misleading statements and omissions became apparent to the market, and the price of PCP common stock fell. As a result of their acquisitions of PCP common stock at artificially inflated prices during the Relevant Period, Plaintiffs suffered economic loss.

243.    In addition on July 24, October 23, and January 15-16, the previously concealed risk attendant with the pullin transactions materialized, reducing PCP's stock price as the market learned of the risk.  PCP had concealed the risk that, by their very nature, at some point in the future the Company would no longer be able to rely on pullin transactions to meet quarterly numbers.  As that occurred, and the Company was unable to pullin a sufficiently large number of transactions from the future, the risk of this concealed strategy materialized and the stock price declined.

244.    The declines in the price of PCP stock pled herein were a direct result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of PCP common stock negates any inference that the loss suffered by Plaintiffs was caused by changed market conditions, macroeconomic or industry factors, or Company- specific factors unrelated to Defendants' wrongful conduct.

245.    The economic loss suffered by Plaintiffs was a direct result of Defendants' wrongful conduct, which inflated the prices of PCP common stock and resulted in the subsequent decline in the value of PCP common stock when Defendants' prior false and misleading statements and omissions were revealed.

## X.    **RELIANCE**

246.    Plaintiffs, through their investment advisor, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing PCP stock.

247.    Their investment advisor began purchasing PCP common stock for Plaintiffs in October 2013.

248. Prior to purchasing PCP stock for Plaintiffs, one or more employees of Plaintiffs' investment advisor actually read, reviewed and relied upon PCP's public disclosures and SEC filings.

249. As Plaintiffs continued to purchase PCP stock throughout 2013 and 2014, Plaintiffs' investment advisor kept abreast of publicly-disclosed developments concerning PCP, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon the statements referenced above.

250. When purchasing PCP stock on behalf of Plaintiffs, Plaintiffs' investment advisor actually read (or heard) and relied on each of the statements described above.

251. Had Plaintiffs' investment advisor known the truth, it would not have purchased PCP common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

252. Plaintiffs are also entitled to the presumption of reliance on the basis of a fraud on the market theory.

253. At all relevant times, the market for PCP's common stock was efficient for the following reasons, among others:

(a) PCP's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, PCP filed periodic reports with the SEC and NYSE;

(c) PCP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

PLAINTIFFS' COMPLAINT                95

(d)    PCP was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

254.    As a result of the foregoing, the market for PCP stock reasonably promptly digested current information regarding PCP from all publicly available sources and reflected such information in PCP's stock price. Under these circumstances, all purchasers of PCP common stock during the Relevant Period suffered similar injury through their purchase of PCP common stock at artificially inflated prices, and a presumption of reliance applies.

255.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

256.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

257.    Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's organic growth and the cause of the Company's poor earnings results throughout the Relevant Period, which the Company attributed to temporary inventory destocking when, in reality, PCP

actually suffered decreased demand for its products. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by PCP were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

258.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PCP who knew that those statements were false when made.

## XII.    <u>CAUSES OF ACTION</u>

### COUNT I
### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
### AND SEC RULE 10B-5 PROMULGATED THEREUNDER
#### (Against Defendants PCP, Donegan, and Hagel)

259.    Plaintiffs repeat and re-allege every allegation set forth above as if fully set herein.

260.    This Count is asserted against Defendants Precision, Donegan, and Hagel for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

261.    During the Relevant Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

262.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of PCP common stock during the Relevant Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)    PCP, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b)    PCP's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pullin sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c)    PCP, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCP from relying on pullin sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCP's key customers—Rolls-Royce— was having a long-term negative impact on PCP's demand by foreclosing PCP from relying on

pullin sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d)    The market-based forecasts and outlook that PCP touted to the market during the Relevant Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e)    Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f)    The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g)    In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCP to meet its EPS guidance;

(h)    As a result of the foregoing, the Defendants' positive statements about PCP's business, operations, and prospects, including its fiscal 2016 EPS target, lacked any basis in fact.

263.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated

in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of PCP common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs, regarding, among other things, the softening in demand for PCP's products; (b) artificially inflate and maintain the market price of PCP common stock; and (c) cause investors, such as Plaintiffs, to purchase PCP common stock at artificially inflated prices and suffer losses when the true facts became known.

264.    Defendant PCP is liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

265.    Defendants Donegan and Hagel are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

266.    As described above, the Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of PCP stock, were either known to the Defendants or were so obvious that the Defendants must have been aware of them.

267.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at PCP, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Relevant Period.

268.    Plaintiffs have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for PCP common stock, which inflation was removed from their price when the true facts became known. Plaintiffs would not have purchased PCP common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

269.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages attributable to the fraud alleged herein in connection with their purchases of PCP common stock during the Relevant Period.

270.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *Murphy et al. v. Precision Castparts Corp. et al.*, 3:16-CV-00521 (D. Oregon), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
### (Against Defendants Donegan and Hagel)

271.    Plaintiffs repeat and re-allege every allegation set forth above as if fully set herein.

272.    This Count is asserted on behalf of Plaintiffs against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

273.    During their tenures as officers and/or directors of PCP, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of PCP, these Defendants had the power and authority to direct the management and activities of the

Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by PCP during the Relevant Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

274.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Donegan and Hagel had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Donegan and Hagel signed the Company's SEC filings during the Relevant Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by PCP during the Relevant Period. As a result of the foregoing, Defendants Donegan and Hagel, as a group and individually, were controlling persons of PCP within the meaning of Section 20(a) of the Exchange Act.

275.    As set forth above, PCP violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of PCP and as a result of their own aforementioned conduct, Defendants Donegan and Hagel are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs as purchasers of PCP common stock. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of PCP, each of these Defendants was culpable for the material misstatements and omissions made by

PCP, including such misstatements as the Company's false financial statements, as set forth above.

276.    As a direct and proximate result of these Defendants' conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of PCP common stock.

277.    Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *Murphy et al. v. Precision Castparts Corp. et al.*, 3:16-CV-00521 (D. Oregon), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT III
## FRAUD (NEW YORK LAW)
**(Against Defendant Donegan Regarding the Credit Suisse Conference)**

278.    Plaintiffs repeat and reallege the above paragraphs as if set forth herein.

279.    Defendant Donegan made material misrepresentations and omissions when he presented at the Credit Suisse Global Industrials Conference.

280.    The Credit Suisse Global Industrial Conference held December 3, 2013, occurred in the State of New York, as did the misrepresentations and omissions by Defendant Donegan.

281.    The material misrepresentations set forth above made at the Credit Suisse Global Industrial Conference were knowingly made by Defendant Dongen with the intent to deceive, and such Dongena's representations omitted and concealed material statements of fact from Plaintiffs.

282.    Defendant Donegan knew his representations were false and/or misleading, and that his omissions were material and rendered his representations misleading, at the time they were made or omitted.

283.   Defendant knew that investors, including Plaintiffs, would receive and rely on such representations, and intended that his false and/or misleading statements would induce investors, including Plaintiffs, to purchase PCP common stock at inflated prices.

284.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased PCP common stock at all, or at the prices they paid, had they known the true facts regarding, inter alia, the reasons for PCP's earnings misses, and its pullin transactions.

285.   As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

## XIV.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray relief and judgment as follows:

(a)   Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(c)   Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XV.    **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 8, 2018

Respectfully submitted,

/s/ Scott F. Kocher

Scott F. Kocher, OSB # 015088
scott@forumlawgroup.com
Forum Law Group LLC
811 Naito Parkway, Suite 420
Portland, Oregon 97204
Tel: 503-445-2102
Fax: 503-445-2120

&

Lawrence M. Rolnick, NY Bar #2024784*
lrolnick@lowenstein.com
Mark B. Kramer, NY Bar #2167146*
mkramer@lowenstein.com
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-262-6700
Fax: 973-597-2469

* Motion for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs*

PLAINTIFFS' COMPLAINT              105